Xavier Becerra
Attorney General of California
Kathleen Boergers
Supervising Deputy Attorney General
Ketakee R. Kane
Michael Goldsmith
Brenda Ayon Verduzco
Deputy Attorneys General
State Bar No. 315117
  1515 Clay Street, 20th Floor
  P.O. Box 70550
  Oakland, CA  94612-0550
  Telephone:  (510) 879-0981
  Fax:  (510) 622-2270
  E-mail:  Brenda.AyonVerduzco@doj.ca.gov
*Attorneys for Plaintiff State of California*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **STATE OF CALIFORNIA, STATE OF NEW YORK, DISTRICT OF COLUMBIA, STATE OF MAINE, STATE OF MARYLAND, STATE OF OREGON,** and the **STATE OF VERMONT,**<br><br>                                    *Plaintiffs,*<br><br>                     **v.**<br><br>**U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; ALEX M. AZAR, II,** in his official capacity as Secretary of Health and Human Services; **THE CENTERS FOR MEDICARE & MEDICAID SERVICES; SEEMA VERMA**, in her official capacity as Administrator of Centers for Medicare and Medicaid Services,<br><br>                                    *Defendants.* | **COMPLAINT**<br>**FOR DECLARATORY RELIEF**<br><br>Administrative Procedure Act Case |

1

**INTRODUCTION**

1.     Plaintiffs the States of California, New York, District of Columbia, Maine, Maryland, Oregon, and Vermont (collectively, the States), bring this action to challenge the unlawful agency action by Defendants, the U.S. Department of Health and Human Services (HHS) and Secretary Alex M. Azar, II (collectively, Defendants), that threatens to undermine access to healthcare coverage, specifically safe and legal abortion, and the States' sovereign laws enacted to protect women's constitutional rights.  Defendants have unlawfully reinterpreted Section 1303 of the Patient Protection and Affordable Care Act (ACA) and issued an onerous and unnecessary regulation designed to restrict women's constitutionally protected reproductive rights by creating barriers to abortion coverage.  In doing so, Defendants seek to frustrate the States' sovereignty by coercing the States to change their policies relating to the protection of abortion care.

2.     A central feature of the ACA is the requirement that every state establish a "health insurance exchange."  Exchanges are marketplaces in which consumers and small businesses can shop for and purchase private health insurance coverage.  The ACA gave states the flexibility to develop and host their own exchanges, or let the federal government establish and run exchanges for them.  An exchange established by the state itself is a state-based exchange (SBE) and those operated by HHS are federally facilitated exchanges (FFE).  In states with FFEs, the exchange may be operated by HHS alone or in conjunction with the state.  And some states have exchanges that are SBE-FPs, meaning they are SBEs but use the federal information technology platform, including the federal exchange website www.Healthcare.gov.[1]

3.     States that choose to implement their own exchanges may tailor the exchanges to their state's unique public health priorities, such as ensuring coverage for services required by state laws for its residents.  An important aspect of developing its own insurance exchange is a state's ability to define standards for and selecting plans that qualify for participation in its

---

[1] In Plaintiff States, California, the District of Columbia, Maryland, New York, and Vermont, operate state-based exchanges (SBEs), while Oregon operates a state-based exchange on the federal platform (SBE-FP), and Maine operates a federally facilitated exchange (FFE). The States represent the diversity contemplated by the ACA, which authorized significant state flexibility in the operation of the States' health insurance markets.

exchange.  State exchanges are responsible for annually certifying or recertifying plans to be sold on their exchanges as qualified health plans (also known as QHPs), plans that cover the essential health benefits (EHB) required under the ACA, as well as any benefits mandated by state law (e.g. abortion coverage).

4.      States have historically retained general police powers to promote and regulate public health.  Since states regulate their own healthcare markets and the ACA intentionally respects the power of the States to govern the individual market, the States of California, New York, Maine, Oregon, and Vermont each require all qualified health plans to provide abortion coverage, while the State of Maryland and the District of Columbia allow and encourage the provision of such coverage.

5.      The States require or allow abortion coverage because it is critical to ensuring that *all* residents have access to comprehensive healthcare services including coverage for abortion.  In the States, more than half a million women[2] are enrolled in, and benefit from, private qualified health plans that offer coverage for abortion services in the States' individual health insurance exchanges.  As such, the Rule threatens the States' policy priorities and flexibility authorized by the ACA.

6.      On December 27, 2019, HHS issued a final rule titled, "Patient Protection and Affordable Care Act:  Exchange Program Integrity" (hereinafter Rule) which contains changes to how State Exchanges and health insurance plans segregate consumers' premium payments for abortion coverage under 45 C.F.R. §156.280.  Patient Protection and Affordable Care Act; Exchange Program Integrity, 84 Fed. Reg. 71,674 (December 27, 2019) (to be codified at 45 C.F.R. pt. 155, 156).  HHS contends the Rule is required to better align implementing regulations

---

[2] This total represents 2019 enrollment data, identifying women of reproductive age, between the ages of 15-49 years old who participate in a qualified health plan that provide abortion coverage, and reaches a total of 509,014 women potentially impacted by the Rule.  In the State of California 388,661 women of reproductive age would be at risk of abortion coverage loss; approximately 56,000 in the State of New York; 8,148 in the District of Columbia; approximately 20,000 in the State of Maine; and 36,205 in the State of Maryland.  This total does not include the States of Oregon and Vermont, for which data was not readily available at the time of filing of this complaint.

of Section 1303 of the ACA with other extraneous federal restrictions on the use of federal funds for abortion services.  However, issuers have been in compliance with those restrictions by creating segregated accounts that could be used only for abortion services.  And in prior guidance, HHS endorsed the practice of billing policy holders in a single transaction as a way to comply with the segregated-use requirements.  But nearly after a decade since the ACA became law, the Rule would now require issuers (insurance companies) to send separate bills—and collect separate payments from policy holders—of an amount no less than $1, for the portion of the insurance premium attributable to abortion coverage.  These changes violate key provisions of the ACA, the Administrative Procedure Act, and the U.S. Constitution, and could potentially cost the States significant federal matching funds for noncompliance.

7.     Once implemented, the Rule will require health issuers selling qualified health plans in states that offer abortion coverage to comply with the onerous requirements of sending two separate bills to each policy holder.  Similarly, HHS presumes that these changes will also apply to the three State exchanges that currently perform premium billing and payment processing for issuers participating in the individual market.  Operationally, the Rule penalizes issuers for doing business in the States—where access to comprehensive reproductive care is protected by state laws that mandate or allow abortion coverage, and in states which have heavily invested in the administration of their own exchange.  Further, the Rule disincentivizes issuers from providing abortion coverage in states that do not yet have specific laws restricting it, by creating barriers to doing so.  In addition, the Rule will require costly changes to the States' coverage and enrollment policies, imposing new oversight responsibilities on the States' agencies, including state regulators and insurance commissioners.

8.     In the end, the Rule will create significantly more problems than those HHS purportedly seeks to solve.  Contrary to the ACA's requirement of equitable access to healthcare, the Rule complicates access to care.  The Rule will increase consumer confusion because those who do not understand the purpose of the two separate bills and payments may inadvertently fail to make complete premium payments on time, putting their coverage at risk of termination.  Indeed, HHS concedes the Rule will likely increase consumer confusion.  84 Fed. Reg. 71,686.

9.     This confusion may result in premium increases or loss of coverage, affecting almost 2.6 million enrollees who receive abortion coverage through a qualified health plan in the 11 impacted state-based exchanges.  84 Fed. Reg. 71,698.  In the States alone, the Rule puts the coverage of over 2.2 million enrollees in the individual market at risk of coverage termination.[3] The Rule will have a disparate impact on women and their access to abortion care—a critically time-sensitive and women-specific procedure.

10.     This is precisely the type of rulemaking that Congress prohibited when it enacted Section 1554 of the ACA.  Section 1554 prohibits the Secretary from promulgating any regulation that creates unreasonable barriers to the ability of individuals to obtain appropriate medical care. 42 U.S.C. § 18114 (2019).  Now, a decade after the passage of the ACA, HHS's onerous new Rule threatens to rescind a cornerstone of the statute's enactment—the authority and flexibility granted to states to operate their state-based exchanges to meet the state's policy priorities.

11.     Moreover, HHS's Rule threatens the States' public fiscs, as noncompliance with the Rule risks millions of federal dollars paid to the States for the administration of health programs. Under the ACA's financial integrity section, 42 U.S.C. § 18033(a)(4) (2018), HHS may conclude that the States' inability to comply, or allow issuers to comply, with the separate billing requirements amounts to a "pattern of abuse" from compliance with HHS standards related to Title I of the ACA.  If "the Secretary determines that an Exchange has engaged in serious misconduct with respect to compliance with the requirements of, or carrying out of activities required" under the ACA, HHS has the authority to rescind up to one percent (1%) of the federal funding dollars due to a state *under any program administered by HHS*.  84 Fed. Reg. 71,678.

12.     HHS acknowledges that the ACA "designate[s] the state insurance commissioners as responsible for monitoring, overseeing, and enforcing the provisions in section 1303."  *Id.* at 71,691-692 (citing § 18023 and the implementing regulations at § 156.280(e)(5)).  Nevertheless,

---

[3]  Collectively the Plaintiff States reported a total enrollment of 2,205,144 in 2019.  This includes 1,513,883 enrollees in the state of California; 271,873 in the state of New York; 18,035 in the District of Columbia; 70,987 in Maine's ACA individual market; 156,963 in the state of Maryland; 148,180 in the state of Oregon; and 25,223 in the State of Vermont.  *See* CMS 2019 OEP State-Level Public Use File, accessible at https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/Marketplace-Products/2019_Open_Enrollment.

HHS asserts that states do not have "exclusive enforcement authority with respect to all provisions in Section 1303" and warns state-based exchanges, that under the authority granted to it by 42 U.S.C. § 18041(c)(2), "the Secretary may step in to enforce the requirement against the non-compliant issuer," in place of the exchange itself.  *Id.*  And HHS hints at now restricting previously afforded state flexibility, reminding "states concerned about enforcement and oversight of these requirements that, under section 1321(c), states may elect not to establish and operate an Exchange, thereby defer[] those responsibilities to HHS."  84 Fed. Reg. 71,694.

13.     The States stand to lose millions of dollars annually for the administration of healthcare programs, which depend on federal dollars.  Jeopardizing these federal matching dollars would significantly harm the States' residents and families, as they support critical healthcare programs and public health initiatives.  Thus, through the Rule's onerous requirements and the resulting personal and societal costs, HHS seeks to thwart the States' laws and policies long committed to women's reproductive freedom.

14.     Further, the Rule exacerbates these harms, by imposing these new requirements on an administratively and operationally infeasible timetable that will cause excessive burdens on the States' health insurance exchanges and health insurance markets.  Numerous state-based exchanges commented, including Covered California, Connect for Health Colorado, Connecticut's Access Health CT, District of Columbia Health Benefit Exchange Authority, New York State of Health, as well as the Attorneys General of California, New York, Oregon, Pennsylvania, and Washington, explaining to HHS that the Rule involved significant administrative complexities, and many raised that "mid-year implementation" of the proposed changes would be "unworkable and burdensome on both states and issuers."  (Comment of Connect for Health Colorado on Proposed Rule (Jan. 08, 2019)).  Blue Shield of California, one of the largest issuers in California, submitted comments estimating that it would take at least 18 months to put these changes into place.  (Comment of Blue Shield on Proposed Rule (Nov. 09, 2018), Jan. 08, 2019).

15.     Even after acknowledging commenters' implementation challenges, HHS's final Rule requires compliance with these changes by June 27, 2020—after open enrollment has been

finalized and mid-plan year.  HHS simply states that, "we believe 6 months is sufficient…to implement the administrative and operational changes to billing processes necessary to comply[,]" while acknowledging that some issuers "may seek to exit the individual market in a state" as a result of the Rule.  84 Fed. Reg. at 71,689, 71,690.  Ostensibly, "such a short time period to implement the new regime is further evidence that the [Rule] is meant to coerce insurers into dropping abortion coverage."  (Comment of Positive Women's Network-USA (PWN-USA) on Proposed Rule (Nov. 09, 2018)).

16.     The States have each taken crucial steps to safeguard women's access to reproductive healthcare and have made this a policy priority.  As mentioned, the States of California, New York, Maine, Oregon, and Vermont all require that qualified health plans provide abortion coverage.  The State of Maryland and the District of Columbia allow for the provision of abortion coverage in health plans.  This commitment to women's reproductive freedom captures the importance of securing coverage to ensure that individuals have access to all the services they may need and have the option of exercising constitutionally protected rights.

17.     California has a long history of protecting women's access to comprehensive reproductive health, including abortion care.  The fundamental right to choose to bear a child or choose to obtain an abortion is the official public policy of the State, protected in both the State's constitution and by statute.  *See* Cal. Const., art. I, § 1; Cal. Health & Saf. Code § 123462(b) (Dering 2019).  In furtherance of these rights, state law requires that all health plans regulated by the State offer abortion coverage as part of their basic healthcare services.  California's Governor recently issued the California Proclamation on Reproductive Freedom in 2019, reaffirming the State's commitment to "uphold women's equality and liberty by protecting their reproductive freedom, educating Californians about their rights to reproductive freedom," reaffirming reproductive rights "and acting as a model for other states that want to ensure full reproductive freedom for women."[4]

_____

[4] *See* https://www.gov.ca.gov/wp-content/uploads/2019/05/Proclamation-on-Reproductive-Freedom.pdf.

18.     New York has also enacted some of the strongest protections for women's access to comprehensive healthcare. New York first legalized abortion in 1970, three years before the Supreme Court established the constitutional protections of *Roe v. Wade*. In 2019, New York enacted the Reproductive Health Act, to align state law further with federal law, explicitly providing that comprehensive reproductive healthcare is a fundamental component of every individual's health, privacy, and equality. N.Y. Pub. Health L. § 2599-aa (2019). Consequently, it is the policy of the state that every individual who becomes pregnant has the fundamental right to choose to carry the pregnancy to term, to give birth to a child, or to have an abortion. *Id.* Thus, New York state law requires that health insurance plans must include abortion coverage, and with the exception of high-deductible plans, must cover abortion care without any cost-sharing.

19.     The District of Columbia's laws do not restrict abortion rights and allow issuers participating in the District's state exchange to offer qualified health plans that provide abortion coverage. All health plans offered on the District's individual insurance Marketplace cover abortion.

20.     Maine enacted the Reproductive Privacy Act in 1993, which declares that "[i]t is the public policy of the State that the State not restrict a woman's exercise of her private decision to terminate a pregnancy before viability." Me. Rev. Stat. tit. 22, § 1598(1). Maine law requires carriers offering health plans in Maine to provide coverage for maternity services, which is designated as part of an "essential health benefits package." Me. Rev. Stat. tit. 24-A, § 4320-D (effective March 19, 2019). Maine law further requires a carrier offering a health plan in Maine that provides maternity services to also provide coverage for abortion services. *Id.* § 4320-M (effective September 19, 2019). Maine's laws thus require all carriers offering health plans on the Marketplace to provide coverage for abortion services.

21.     Maryland law provides that the state "may not interfere with the decision of a woman to terminate a pregnancy" before viability of the fetus, to protect the woman's life or health, or if the fetus bears a genetic defect. Md. Code Ann., Health - Gen. § 20-209(b). In addition, Maryland's Medicaid program covers abortion services for eligible individuals with state-only

8

funds.  Md. Cod. Regs. Tit. 10, § 09.02.04(G).  Although Maryland does not have a law that requires private health plans to cover abortion services, all health plans offered on the state's individual insurance marketplace cover abortion.

22.     Oregon has long been a leader in enacting policies and programs that support access to high-quality reproductive health services.  In 2017, Oregon passed the Reproductive Health Equity Act (House Bill 3391), which requires private health insurance plans to cover abortions with no out-of-pocket costs.  Specifically, the law requires all health benefit plans offered in the state to provide coverage for abortions and prohibits imposition of "a deductible, coinsurance, copayment or any other cost-sharing requirement on the coverage required by this section."  Or. Rev. Stat. Ann. § 743A.067(2)-(3).

23.     Vermont passed a Freedom of Choice Act in 2019,  *See* 2019 Vt. Laws No. 47, codifying that, "[t]he State of Vermont recognizes the fundamental right of every individual who becomes pregnant to choose to carry a pregnancy to term, to give birth to a child, or to have an abortion."  Vt. State. Ann. tit. 18, § 9493(b).  Consistent with Vermont state policy, Vermont has selected an essential health benefit benchmark plan, since 2013, that includes coverage of abortion services.  All individual and small group health plans in Vermont are therefore required to offer coverage for abortion services.  As a result, the final rule impacts not a subset of the market, but the entirety of Vermont's merged individual and small group market.

24.     The States seek declaratory relief on the grounds that the Rule violates the Administrative Procedure Act (APA), 5 U.S.C § 706, because it is contrary to law, exceeds Defendants' authority, and is arbitrary and capricious.  Additionally, the Rule is unlawful under the Constitution's Tenth Amendment.

**JURISDICTION**

25.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because this case involves a civil action arising under the Constitution and laws of the United States.  Further, the Court has jurisdiction under 28 U.S.C. § 1361 because this is an action to compel officers or agencies of the

9

United States to perform a duty owed to Plaintiffs.  Jurisdiction is also proper under the judicial review provisions of the APA, 5 U.S.C. § 702.

26.    An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other appropriate relief pursuant to 28 U.S.C. §§ § 1361, 2201-2202, 5 U.S.C. §§ 705-706, and the Court's equitable powers.

27.    Defendants' issuance of the Rule on December 27, 2019, constitutes a final agency action and is therefore judicially reviewable within the meaning of the APA.  5 U.S.C. §§ 704, 706.

## VENUE

28.    Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391(e) because the State of California and its Attorney General have offices in Oakland, California, and this action seeks relief against the United States, agencies of the United States, and officials acting in their official capacities.

## INTRADISTRICT ASSIGNMENT

29.    Pursuant to Civil Local Rules 3-5(b) and 3-2(c), assignment to the Oakland Division or San Francisco Division is appropriate because Plaintiff the State of California and its Attorney General maintain offices therein.

## PARTIES

30.    Plaintiff the State of California, by and through Attorney General Xavier Becerra, brings this action.  California is a sovereign state in the United States of America.  The Attorney General is the chief law enforcement officer of the State and has the authority to file civil actions in order to protect the health and welfare of Californians and advance the State's interest in protecting women's access to reproductive healthcare.  Cal. Const., art. V, § 13; Cal. Bus. & Prof. Code § 321.  This challenge is brought pursuant to the Attorney General's independent constitutional, statutory, and common law authority to represent the public interest.

31.     Plaintiff the State of New York, by and through its Attorney General Letitia James, brings this action.  New York is a sovereign state in the United States of America.  The Attorney General is New York State's chief law enforcement officer and is authorized to advance the State's interest in protecting women's access to reproductive healthcare services.

32.     Plaintiff the District of Columbia (the District), by and through its Attorney General Karl A. Racine, brings this action.  The District is a municipal corporation empowered to sue and be sued, and is the local government for the territory constituting the permanent seat of the federal government.  The Attorney General is the Chief Legal Officer for the District and possesses all powers afforded the Attorney General by the common and statutory law of the District.  The Attorney General is responsible for upholding the public interest and has the authority to file civil actions in order to protect the public interest.  D.C. Code § 1-301.81.

33.     Plaintiff the State of Maine, by and through its Attorney General Aaron M. Frey, brings this action.  Maine is a sovereign state of the United States of America.  The Attorney General of Maine is a constitutional officer with the authority to represent the State of Maine in all matters and serves as its chief legal officer with general charge, supervision, and direction of the State's legal business.  Me. Const. art. IX, Sec. 11; Me. Rev. Stat. tit. 5, §§ 191 *et seq.*  The Attorney General's powers and duties include acting on behalf of the State and the people of Maine in the federal courts on matters of public interest.  The Attorney General has the authority to file suit to challenge action by the federal government that threatens the public interest and welfare of Maine residents as a matter of constitutional, statutory, and common law authority.

34.     Plaintiff the State of Maryland, by and through its Attorney General Brian E. Frosh, brings this action.  Maryland is a sovereign state in the United States of America.  The Attorney General is Maryland's chief legal officer with general charge, supervision, and direction of the State's legal business.  The Attorney General's powers and duties include acting on behalf of the State and the people of Maryland in the federal courts on matters of public concern.  Under the Constitution of Maryland, and as directed by the Maryland General Assembly, the Attorney General has the authority to file suit to challenge action by the federal government that threatens

the public interest and welfare of Maryland residents.  Md. Const. art. V, § 3(a)(2); 2017 Md. Laws, Joint Resolution 1.

35.     Plaintiff the State of Oregon, by and through its Attorney General Ellen Rosenblum, brings this action.  The State of Oregon is a sovereign state of the United States of America. Attorney General Rosenblum is the Chief Law Officer of Oregon and is empowered to bring this action on behalf of the State of Oregon and its affected state agencies.  Or. Rev. Stat. §§ 180.060, 180.210, 180.220.

36.     Plaintiff the State of Vermont, by and through its Attorney General, Thomas J. Donovan, brings this action.  Vermont is a sovereign state in the United States of America.  The Attorney General is the state's chief law enforcement officer and is authorized to pursue this action pursuant to Vt. Stat. Ann. tit. 3, §§ 152 & 157.

37.     The States have an interest in ensuring women's reproductive healthcare is both available and accessible.  Healthcare is one of the primary powers of the States.  Moreover, under Section 1303, states are primarily responsible, through their insurance commissioners and regulating bodies, for the regulation of health insurance.  Defendants' actions interfere with this authority.

38.     The States rely on Defendants' compliance with both procedural and substantive requirements of the APA so they can meaningfully participate in an impartial and public decision-making process that is consistent with the ACA's requirements of equitable access to healthcare. This is especially true in matters related to federal regulatory schemes and agency activities that may have significant adverse impacts on access to comprehensive healthcare, including access to abortion coverage.

39.     Each State is aggrieved by the actions of Defendants and has standing to bring this action because of the injury to its state sovereignty caused by Defendants' issuance of the illegal Rule, including immediate and irreparable injuries to its sovereign, quasi-sovereign, and proprietary interests.  In particular, the States will suffer concrete and substantial harm because the Rule frustrates the States' public health interests by encumbering women's access to abortion services made available through qualified health plans.

40.     Further, the States are aggrieved by the actions of Defendants and have standing to bring this action because of the injuries that will be caused to the States by the implementation and enforcement of Defendants' Rule creating unnecessary and costly requirements that will likely limit women's ability to obtain abortion services.  The States will suffer concrete and substantial harm because they will incur unnecessary administrative costs caused by the Rule's onerous burdens on the States' exchanges and regulatory agencies.  The Rule will also cause the States additional injuries associated with resulting unwanted pregnancies and the related attendant harms and increasing uncompensated care costs for entire families stemming from the inadvertent loss of healthcare coverage for failure to pay the separate bill.

41.     Defendant, Alex M. Azar, II, is Secretary of HHS and is sued in his official capacity. Secretary Azar has responsibility for implementing and fulfilling HHS's duties under the Constitution and the APA.

42.     Defendant, Seema Verma, is Administrator of the Centers for Medicare and Medicaid Services (CMS) and is sued in her official capacity.  Administrator Verma has responsibility for implementing and fulfilling CMS's duties under the Constitution and the APA.

43.     Defendant, HHS, is a federal agency of the United States government and bears responsibility, in whole or in part, for the acts complained of in this Complaint.  CMS is a federal agency and an entity within HHS.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.    THE ACA AND SECTION 1303 ABORTION FUNDING RESTRICTIONS

44.     In 2010, Congress enacted the ACA, landmark legislation that enabled more than 20 million Americans to gain health coverage.  The ACA vastly increased coverage by expanding the traditional Medicaid program, providing subsidies to lower the cost of coverage, and created effective health insurance exchanges to allow consumers a marketplace with choices for private health insurance coverage.  Among its many reforms, the ACA prohibited issuers from charging people with pre-existing health conditions, such as pregnancy, more for care based on their health status, charging women more than men, or denying people the coverage they need.  The law

created consumer protections in the private insurance market, limiting issuers' ability to set annual lifetime limits on total benefits or rescind coverage, except in cases of fraud.  And issuers were required to cover dependents up to age 26 under their parents' health plans, include annual out-of-pocket limits, and provide rebates to the insured if total benefits do not exceed statutory shares of premiums received.  The ACA improved the quality, accessibility, and affordability of health insurance coverage both for people who were already insured and for the previously uninsured.  *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 538 (2012) (*NFIB*); 42 U.S.C § 18091(2)(C), (F) & (G) (2019).

45.     To ensure even more broad-based access to health insurance, the ACA included key provisions, primarily Section 1554 and Section 1557, to create and safeguard parity in healthcare access.  Among other things, the ACA's Section 1554 prohibits the Secretary of HHS from promulgating any regulation that creates unreasonable barriers to the ability of individuals to obtain appropriate medical care, impedes timely access to healthcare, or limits the availability of treatment for the full duration of a patient's medical needs.  42 U.S.C. § 18114.

46.     Section 1557 of the ACA established the first federal law to prohibit a broad range of health programs or activities—including the growing health insurance exchange—from discriminating against individuals on the basis of any classification listed under different federal civil rights statutes, such as race, color, national origin, and sex.  42 U.S.C. § 18116 (2019).

47.     These provisions were designed to guarantee that the benefits of the ACA—expanded healthcare coverage, patient protections, and reductions to rising healthcare costs—were attainable by all.  Together, Sections 1554 and 1557 specifically addressed the numerous ways in which regulatory schemes might deny these opportunities and protections to certain vulnerable groups, such as women, those with preexisting conditions, and low-income communities of color.

48.     The ACA's comprehensive transformation of the country's healthcare system contemplated the important issue of abortion coverage.  In enacting the ACA, Congress struck a balance between maintaining restrictions on federal funding for abortion, while ensuring that states had flexibility to permit coverage in the private market.  Most relevant to these restrictions is the Hyde Amendment, a restriction on the use of federal Medicaid funds for abortion services,

14

in the annual appropriations legislation that funds the activities and services provided by HHS. The Hyde Amendment allows for certain, limited exceptions for the termination of pregnancies that are the result of rape or incest, or if a woman suffers from a life-threatening physical condition caused by or arising from the pregnancy itself, as certified by a physician. *See* 42 C.F.R. §§ 441.202, 441.203, and 441.206.

49.     The ACA's implementing regulations, 45 C.F.R. Parts 155 and 156, established certain standards for the creation and regulation of exchanges and participating health issuers. These regulations authorized HHS to oversee exchange program compliance with quality standards related to Title I of the ACA to ensure their financial integrity, including the authority to conduct investigations and annual audits.

50.     And through Section 1303, Congress included additional standards that prohibited using federal funds, specifically federal advance premium tax credits (APTCs) or cost-sharing reductions (CSRs), to pay for abortion coverage.  In Executive Order No. 13535, President Obama established that the ACA maintains current Hyde Amendment restrictions governing abortion policy and extends those restrictions to the newly created health insurance exchanges. 75 Fed. Reg. 15,599 (Mar. 29, 2010).  Since its inception, Section 1303 has required separate accounting and transparency requirements for coverage of abortion services (for which federal funding is prohibited), provided by qualified health plans sold through the individual health insurance exchanges.

51.     Section 1303 grants significant latitude to state and private issuers.  First, the section recognizes states' sovereignty in the regulation of healthcare and provides flexibility for states to make the decision about abortion coverage provided through their respective exchanges.  Second, the section sets special rules to allow participating issuers the option of offering such coverage in qualified health plans, but prohibits the use of federal funds to pay for abortion services, "based on the law as in effect as of the date that is six months before the beginning of the plan year involved," unless the pregnancy is a result of rape, incest, or would endanger a woman's life. *See* Patient Protection and Affordable Care Act, Pub. L. 111-148, § 1303, 124 Stat. 119, 896; 42 U.S.C. § 18023 (2019).

52.     Consequently, since the implementation of health insurance exchanges under the ACA, qualified health plan issuers may not use federal exchange subsidies, specifically APTCs or CSRs, to pay for otherwise legal abortion services for which federal funding is prohibited.  42 U.S.C. § 18023(b)(2)(A).

53.     Section 1303 provides that if a qualified health plan includes—or is required to include—coverage of abortion services, issuers must charge all policy holders at least one dollar ($1) per month for the premium attributable to abortion services, which must then be deposited and maintained in a separate allocation amount.  The remainder of the insurance premium not related to abortion services must be deposited and maintained in a separate account. 42 U.S.C. § 18023(b)(2)(B)(i)-(ii) and (b)(2)(C)-(b)(2)(D).  Further, issuers are required to provide notice to enrollees of the qualified health plan's inclusion of abortion coverage, "only as part of the summary of benefits and coverage explanation, at the time of enrollment, of such coverage." *Id.* § 18023(b)(3)(A).  Finally, the statute assigns State health insurance commissioners the task of ensuring that issuers of qualified health plans comply with requirements to segregate exchange plan funds. *Id.* § 18023(b)(2)(E).

54.     In 2014, only a few months after the implementation of Section 1303 in the individual market, and amid the ongoing development of state-based and federally facilitated exchanges, a Government Accountability Office (GAO) report identified some inconsistencies regarding the implementation of Section 1303.  The GAO conducted a national review of state with no laws restricting abortion coverage, and rested its report on an examination of a sample of only eighteen qualified health plan issuers in ten states where qualified health plans cover abortion.  Of these, the report found that two failed to collect the statutory minimum of $1 per enrollee per month, four failed to include notices of abortion coverage, and most did not collect payments as regulations then allowed—by sending a bill itemizing the separate payments or by sending separate bills for the coverage.

55.     In 2015, HHS responded to the GAO report with a final rule, which identified several alternatives issuers could pursue to satisfy the statutory requirements of Section 1303.  HHS Notice of Benefit and Payment Parameters for 2016, 80 Fed. Reg. 10,750, at 10,840 (Feb. 27,

2015).  Issuers were either to (1) send the enrollee a single monthly bill that separately itemizes

the premium amount for abortion services; (2) send a separate monthly bill for these services; or

(3) send the enrollee a notice at or soon after the time of enrollment that the monthly bill includes

a separate charge for such services and specify the charge.  *Id*.  In October 2017, CMS's Center

for Consumer Information and Insurance Oversight (CCIIO) issued a bulletin that again listed

these same options as ways for issuers to comply with the segregated funding requirements.[5]

56.     To date, HHS and CMS have issued no reports of complaints regarding any violations

of Section 1303 or the misuse of federally appropriated funds for abortion services or coverage.

57.     More broadly, the enactment of the ACA, Sections 1554, 1557, and 1303 maintain

current federal restrictions governing abortion policy, but nevertheless preserve the longstanding

flexibility afforded to the States related to women's reproductive freedom and sets national goals

for expanding access to affordable healthcare coverage.

## II.     THE STATES HAVE ENACTED LAWS AND POLICIES PROTECTING ACCESS TO ABORTION CARE

58.     The States have a sovereign interest in the creation and enforcement of a legal code.

Pursuant to these interests, the States have grounds to challenge HHS's actions because the Rule

undermines their sovereignty and threatens their authority to regulate matters that the States

control by frustrating enforcement of state laws and policies aimed at protecting access to

abortion care.

### A.     California

59.     California laws protect a woman's right to healthcare and specifically protect a

woman's right to abortion.  In 1972, California voters amended the state Constitution to include a

right of privacy among the inalienable rights protected in the State.  Cal. Const. Art. I, § 1*; Chico

Feminist Women's Health Ctr. v. Butte Glenn Med. Soc'y*, 557 F. Supp. 1190, 1201-1202 (E.D.

Cal. 1983) (citing *White v. Davis*, 13 Cal. 3d 757 (1975)).  The right to privacy under article I,

section 1, provides "all women in this state rich and poor alike possess a fundamental

---

[5] https://www.cms.gov/CCIIO/Resources/Regulations-and-Guidance/Downloads/Section-1303-Bulletin-10-6-2017-FINAL-508.pdf

constitutional right to choose whether or not to bear a child." *Comm. to Defend Reprod. Rights v. Myers*, 29 Cal. 3d 252, 262 (1981).  Accordingly, state law confirms that private parties cannot interfere with the right to procreative choice under article I, section 1.  *Chico*, 557 Supp. at 1202-03; *Hill v. Nat'l Collegiate Athletic Ass'n*, 7 Cal. 4th 1, 20 (1994).  In addition, the constitutional right of a woman to decide whether to bear a child or terminate a pregnancy, guaranteed under article I, section 1, is also protected from State interference.  *Chico*, 557 F. Supp. at 1202; *Myers*, 29 Cal. 3d at 284.

60.  Additional state laws track these constitutional protections.  The Reproductive Privacy Act of 2002 (RPA) declared as state public policy that, "[e]very woman has the fundamental right to choose to bear a child or to choose and to obtain an abortion."  Cal. Health & Saf. Code § 123462(b).  The Reproductive Privacy Act expressly provides that "[t]he state may not deny or interfere with a woman's right to choose or obtain an abortion …."  Cal. Health & Saf. Code § 123466.  As a result, in California, all health plans are required to cover abortion services.  *See Missionary Guadalupanas of Holy Spirit Inc. v. Rouillard*, 38 Cal. App. 5th 421, 427–28 (Ct. App. 2019), review denied (Nov. 20, 2019) (finding that "[b]ecause California law guarantees every woman the right to choose whether to bear a child or obtain an abortion, the only legally tenable interpretation of the law is that abortions are basic health care services, which health care service plans are required to cover.").

**B.  New York**

61.  On January 22, 2019, New York State signed into law the Reproductive Health Act, which legalizes abortion at any time "when necessary protect the woman's life or health."[6]  The Act updates New York State law to address "constitutional flaws and recognize a woman's fundamental right to access safe, legal abortion.  The bill moved abortion from the Penal Law to the Public Health Law, which removes longstanding harmful and burdensome barriers to accessing reproductive healthcare and protects New Yorkers against future Federal intrusion."  *Id.*  The Reproductive Health Act is codified in N.Y. Pub. Health L. § 2599-aa (2019).  Additionally, New York Insurance Law §§ 3216(l), 4304(l), 4306-h, 4328(b)(1) provides that plans, including

---

[6] https://nyassembly.gov/Press/files/20190122.php

those participating on the New York State of Health, New York's health plan exchange, cover ambulatory patient services and prescription drugs.  New York regulation prohibits health plans from excluding coverage by type of illness, accident, treatment, or medical condition except as expressly permitted in the regulation.  *See* N.Y. Comp. Codes R. & Regs. tit. 11, § 52.16(c).  Medically necessary abortion services are not listed in the regulation and therefore cannot be excluded as further clarified in § 52.16(o).

## C.   District of Columbia

62.   Although the District does not have a law that requires private health plans to cover abortion services, the District's laws do not restrict abortion coverage and allow issuers participating in the District's state exchange to offer qualified health plans that provide abortion coverage.  In fact, all health plans offered on the District's individual insurance marketplace cover abortion.

63.   Moreover, the District of Columbia protects a woman's right to abortion.  A 1901 law that criminalized abortion except to preserve the life or health of the mother (D.C. Code § 22-101) was repealed in 2003 along with other outdated statutes.  The Committee Report on Bill 15-79, the "Elimination of Outdated Crimes Amendment Act of 2003," noted that the law was "outdated and unnecessary because abortion is not appropriate for criminal sanction, particularly in light of the U.S. Supreme Court's decision in *Roe v. Wade*."

## D.   Maine

64.   Maine's Reproductive Privacy Act declares that "[i]t is the public policy of the State that the State not restrict a woman's exercise of her private decision to terminate a pregnancy before viability."  Me. Rev. Stat. tit. 22, § 1598(1).  Consistent with this state policy, all health plans as defined in Maine's Insurance Code are required to cover abortion services.  Me. Rev. Stat. tit. 24-A, §§ 4320-D & 4320-M.

65.   Maine has taken recent action to support women's reproductive freedom, by enacting a new law to protect insurance coverage of all forms of reproductive healthcare.  In 2019, Maine enacted a requirement that the State pay for abortion services for Medicaid eligible women, which services are not federally approved Medicaid services.  Me. Rev. Stat. Ann. tit. 22, § 3196

(effective September 19, 2019).  In the same legislative vehicle, the state enacted a requirement that all health plans offering maternity services shall also provide coverage for abortion services, with a possible exemption for a religious employer as defined in 26 U.S.C. § 3121(w)(3)(A). Me. Rev. Stat. Ann. tit. 24-A, § 4320-M.

### E.  Maryland

66.     Maryland has long offered strong protections for women's rights to access healthcare. Women's abortion rights have been firmly protected under Maryland law since voters in 1992 overwhelmingly passed a referendum question protecting a woman's right to abortion.  Richard Tapscott, *MD Backs Measure on Abortion Rights*, Washington Post (Nov. 4, 1992)[7]; Md. Code Ann., Health Gen. § 20-209.  The State of Maryland may not interfere with the decision of a woman to terminate a pregnancy: (1) before the fetus is viable; or (2) at any time during the pregnancy if the termination is necessary to protect the life or health of the woman; or the fetus is affected by genetic defect or serious deformity or abnormality.  Md. Code Ann., Health Gen. § 2-209(b).  Maryland's recognition of a woman's right to abortion is further reflected by Maryland's decision to voluntarily provide state-funded abortion coverage for eligible women in its Medicaid program.  Md. Code Regs. 10.09.02.04G. Maryland also offers abortion services to incarcerated women.  Md. Code Ann., Correctional Srvs. § 9-601(j)(2)(v).

67.     In Maryland abortion coverage is part of the essential health benefits package, required of all non-grandfathered individual and small group plans sold on Maryland's Health Benefit Exchange, and all individual qualified health plans cover abortions.

### F.  Oregon

68.     Oregon also recognizes the critical nature of access to comprehensive, high quality reproductive health care for its residents.  In 2017, Oregon passed the Reproductive Health Equity Act (House Bill 3391), which requires private health insurance plans to cover abortions with no out-of-pocket costs and bans discrimination in the delivery of reproductive health services.  The law prohibits a public body, including any state or local government agency or employee of the

---

[7] https://www.washingtonpost.com/archive/politics/1992/11/04/md-backs-measure-on-abortion-rights/cb000417-7fed-430a-be69-79203fcd2de2/.

agency from interfering with or restricting benefits, facilities, services or information regarding a woman's right to choose to terminate a pregnancy.  Or. Rev. Stat. Ann. § 659.880.  Specifically, the Reproductive Health Equity Act requires all health benefit plans offered in the state to provide coverage for abortions and prohibits the imposition of "a deductible, coinsurance, copayment or any other cost-sharing requirement on the coverage required by this section."  Or. Rev. Stat. Ann. § 743A.067(2)-(3).

### G. Vermont

69.     Vermont also moved to protect abortion rights by enacting the Freedom of Choice Act in 2019.  *See* 2019 Vt. Laws No. 47.  As the legislature explained its intent:  "Currently Vermont does not impose legal restrictions on the right to abortion. . . . The General Assembly intends this act to safeguard these existing rights to access reproductive health services in Vermont by ensuring those rights are not denied, restricted, or infringed by a governmental entity."  *Id.* § 1.  And, as codified:  "The State of Vermont recognizes the fundamental right of every individual who becomes pregnant to choose to carry a pregnancy to term, to give birth to a child, or to have an abortion."  Vt. State. Ann. tit. 18, § 9493(b).

70.     The act further provides:  "A public entity shall not . . . interfere with or restrict, in the regulation or provision of benefits, facilities, services, or information, the choice of a consenting individual to terminate the individual's pregnancy."  Vt. Stat. Ann. tit. 18, § 9497(2). Likewise, "A public entity shall not . . . interfere with or restrict, in the regulation or provision of benefits, facilities, services, or information, the choice of a health care provider acting within the scope of the health care provider's license to terminate or assist in the termination of a patient's pregnancy."  *Id.* § 9497(4).  The statute further provides a private right of action against a public entity for any "individual injured as a result of a violation of this chapter," including costs and attorney's fees as well as injunctive relief.  *Id.* § 9498.

71.     Vermont also aims to protect women's reproductive freedom through its healthcare exchange.  As such, since 2013, Vermont has selected an essential health benefit benchmark plan that includes coverage of abortion.  All individual and small group health plans in Vermont are therefore required to offer coverage of abortion services.

## III.  HHS's Illegal Rule Restricts Access to Abortion Coverage and Harms the States and Their Residents

72.     Defendants' new Rule represents a capricious intent to frustrate the status quo by imposing upon issuers and state exchanges unnecessary separate billing requirements.  Section 1303 of the ACA prohibits the use of federal funds for abortion services, and current implementing regulations provided issuers with various methods of complying with the statute's requirements by providing appropriate notice, sending single bills with itemized amounts, and creating segregated accounts that could only be used to pay for abortion services.  As discussed above, both in 2015 and 2017, HHS guidance specifically allowed issuers either to: (1) send the enrollee a single monthly bill that separately itemizes the premium amount for abortion services; (2) send a separate monthly bill for these services; or (3) send the enrollee a notice at or soon after the time of enrollment that the monthly bill includes a separate charge for such services and specify the charge.  *See* ¶55.

### A.     Summary of the Rule's Separate Billing Requirements

73.     The Rule changes the statute's implementing regulations, 45 C.F.R. § 156.280, in two significant ways.  First, the Rule requires issuers to separately bill for the portion of the premium attributable to abortion services (an amount no less than $1).  Second, the Rule requires a separate payment from consumers.  Issuers can no longer send a single monthly invoice or bill that itemizes the separate amount for abortion services, or notify enrollees as part of the summary of benefits and coverage explanation at the time of enrollment.  Instead, issuers will need to send a separate monthly bill, either by mail (in an envelope containing two separate bills) or electronically (in two separate emails), to each policy subscriber.  And consumers would be instructed to no longer pay the premium total in one payment but must pay each bill separately, either by separate paper checks or by two electronic transactions.

74.     If implemented and enforced, HHS's new Rule will unnecessarily disrupt the way in which issuers that provide abortion coverage bill for healthcare coverage in the States, by forcing an irrational and onerous regulatory scheme that singles out and limits access to a critical women's healthcare procedure—abortion.

75.     Further, the final Rule will allow issuers to modify the benefits of their qualified health plan, either at the time of enrollment or during a plan year, to effectively allow enrollees to opt out of abortion coverage by not paying the separate bill for such services.  This opt out policy was neither included in the proposed rule, nor made available for notice-and-comment prior to its inclusion in the final Rule.  And unlike the accelerated six-month compliance grace period for separate billing changes to § 156.280(e)(2), this change will become effective on February 25, 2020.  84 Fed. Reg. 71,687.

76.     HHS is essentially *expediting* the Rule's end goal of circumscribing access to abortion, by instituting a policy of non-enforcement against issuers that allow policy holders to opt out of the otherwise applicable and substantive requirement to include abortion coverage as a benefit in their qualified health plan.  HHS intends to disincentivize abortion coverage by encouraging issuers to permit policy holders to modify the benefits *required* in their qualified health plan and remove the abortion coverage benefit by simply choosing not to pay the separate bill of $1.  84 Fed. Reg. 71,686.  No other health benefit can be excised from the policy in this manner.  This non-enforcement policy demonstrates HHS's capriciousness and disregard for state laws that require abortion coverage.  It prompts unnecessary consumer confusion about what they are opting out of and leaves many affected issuers in states that require abortion coverage with an illusory option not available to them unless issuers choose to violate their respective state laws.

77.     While HHS indicates that issuers must take appropriate measures to ensure that non-payment is not accidental due to unfamiliarity with the Rule's changes, by providing a policy holder with the opportunity to check a box on their bill, or pushing a button on their online bill—confusion as to why this is necessary or an option will nevertheless result.  *Id.* at 71,687.  Additionally, "an opt-out [by a policy holder] would be effective for the remainder of the benefit year," because they "would not be allowed to retract their opt-out decision and reinstate coverage" by similarly choosing to simply opt back in and pay $1.  *Id.* at 71,687.  The policy holder's decision to opt out of that coverage would apply to all persons in the enrollment group under the policy, including dependents (such as adult children up to the age of 26) and spouses. *Id.*

78.     This represents an assault on the States' right to prioritize and mandate procreative choice and infringes on the enrollee's ability to obtain comprehensive health services.  The States could have voiced such concerns with HHS's new non-enforcement policy related to the discretionary opt out alternative granted to issuers, but none were presented the opportunity for notice-and-comment during the proposed rule's comment period.  In fact, the States could have raised that this policy is irrational, as it is not mandatory, and it is not a viable option for states with abortion coverage mandates.  Nor could this be a logical outgrowth of the proposed rule's changes or submitted comments, because the States could not have seriously contemplated this as a viable option for issuers in their states, much less mid-plan year.  At bottom, the Rule serves to actively impede the provision of abortion services in the States.

79.     HHS's stated goal in promulgating this Rule is to "better align with the intent of section 1303 of the PPACA."  84 Fed. Reg. 71,685.  But, HHS wholly fails to provide an adequate justification for this change.  Nowhere in the Rule does HHS identify any evidence or reports demonstrating that federal funds, through advance premium tax credits, cost-sharing reductions or otherwise, have been inappropriately used to pay for the provision of abortion services in violation of Section 1303.  And nowhere does HHS indicate that the department has conducted any due diligence in renewing or revisiting the five-year old GAO findings of 2014.  HHS simply states that the Rule will address remaining issuer compliance issues, "if any, previously identified" in the GAO report, and that "regardless of whether there are ongoing compliance issues," its primary goal is to "better align" regulatory requirements with the statute.  *Id.* at 71,692.

80.     The real misalignment lies with HHS's unsupported justification for the changes in the Rule.  HHS even offers up—after-the-fact—numerous commenters' concerns regarding the transparency of qualified health plans and coverage of abortion services as evidence to justify implementation of the Rule in only six months.  Instead, HHS claims additional delay would be "imprudent," "given that [HHS is] now aware of these consumer concerns."  *Id.* at 71,690.

81.     Abating consumers' speculative concerns about transparency is yet another purported basis for HHS's opt out policies that issuers could develop as early as February 25, 2020, and

flatly constitutes capricious rulemaking.  Indeed, the Rule represents unreasonable agency action in search of a problem to implement regulatory burdens that solely frustrate the provision of abortion services.

> **B.     The Rule Exceeds Statutory Authority by Imposing Unreasonable Burdens on the Provision of Abortion Coverage**

82.     Established canons of statutory interpretation render the Rule an unreasonable exercise of authority by HHS.  The Rule seeks to amend the implementing regulations of Section 1303, by adding § 156.280 (e)(2)(ii)-(iii), requiring qualified health plans to:

> (A) *Send to each policy holder* of a QHP [qualified health plan] monthly bills for each of the amounts specified in paragraphs (e)(2)(i)(A) and (B) of this section, *either by sending separate paper bills which may be in the same envelope or mailing, or by sending separate bills electronically, which must be in separate emails or electronic communications*; and
>
> (B) Instruct the policy holder to pay each of the amounts specified in paragraphs (e)(2)(i)(A) and (B) of this section through separate transactions. Notwithstanding this instruction, if the policy holder fails to pay each of these amounts in a separate transaction as instructed by the issuer, the issuer may not refuse the payment and initiate a grace period or terminate the policy holder's QHP coverage on this basis.
>
> (iii) Deposit all such separate payments into separate allocation accounts as provided in paragraph (e)(3) of this section. In the case of an enrollee whose premium for coverage under the QHP is paid through employee payroll deposit, the separate payments required under paragraph (e)(2)(i) of this section shall each be paid by a separate deposit.

84 Fed. Reg. 71,710 (italicized for emphasis).

83.     The Rule cannot be reconciled with either the text or purpose of Section 1303.

84.     The statute's plain text is clear.  Section 1303(a) provides that any state may elect to prohibit or authorize abortion coverage.  42 U.S.C. § 18023(a).  Subsection (b) establishes "special rules relating to coverage of abortion services" that involve the "prohibition on the use of Federal funds" in state-based and federally facilitated exchanges.  § 18023(b)(1)-(2).  While Section 1303(B) requires that payments be collected and deposited in separate accounts to ensure separate allocation, it does not concern itself with *how* the payments are collected from enrollees. The import of Section 1303 is rather, how federal funds (attributable to essential health benefits

25

and possibly subsidized by premium tax credits) are spent, because these are prohibited from being commingled or *spent* on abortion services.

85.     In addition, by statute, qualified health plans that provide abortion services are required to notify enrollees "*only* as part of the summary of benefits and coverage explanation, *at the time of enrollment* of such coverage." 42 U.S.C. § 18023(b)(3)(A).  In spite of the statutory limitation, the Rule requires issuers to provide additional notice related to the provision of abortion coverage within a qualified health plan.  Under the new Rule and contrary to the statute's instruction, issuers are required to notify enrollees on an on-going monthly basis of their abortion coverage through the separate bills.  The 2015 final regulations observed that section 1303 did not mandate a monthly notice, explaining that section 1303 allows, but does not require a qualified health plan issuer to identify the separate premium for abortion services *on the monthly premium bill* in order to comply with the separate payment requirement.  80 Fed. Reg. 10750, at 10840 (Feb. 27, 2015).

86.     Moreover, Section 1303's notice provision states that notice "*shall* provide information *only* with respect to *the total amount of the combined payments* for services." 42 U.S.C. § 18023(b)(3)(B) (emphasis added).  It does not state that separate amounts for each service covered by the plan shall identified.  Therefore, not only is notice required only at the time of enrollment, but it is also limited to the total amount of the combined premium payments for services.

87.     The purpose of the statute is clear:  to ensure that funds collected are directed to, and maintained in, segregated accounts to guarantee that any payment for abortion services are made explicitly with premium payments collected for such services.

88.     Plainly put, the Rule's new provisions requiring separate billing and separate payments for abortion coverage do little to mitigate the risk of how issuers treat abortion and non-abortion related funds.  Rather, the purpose of Section 1303 lies in the establishment of the segregated accounts and funds that are used to pay for abortion services.  HHS's new Rule will merely increase the costs of abortion coverage for issuers, State exchanges, and individuals.

89.     The Rule, if implemented, would expand the requirement that issuers "collect" separate payments beyond statutory requirements.  Section 1303 of the ACA and § 156.280 do not specify—and need not specify—the method an issuer must use to comply with the separate payment requirement.  The previous regulations make clear that Section 1303 may be satisfied in a number of ways, discussed above in paragraph 55.

90.     Section 1303 itself confirms this.  The provision relevant to the Rule's promulgation is titled, "[p]rohibition *on the use* of [f]ederal funds" which specifies that "the issuer of the plan shall not *use* any amount attributable to" federal dollars, specifically in the form of ACA subsidies like advanced premium tax credits or cost-sharing reductions to pay for abortion services.  42 U.S.C. § 18023(b)(2)(A) (emphasis added).  Section 1303 is primarily concerned with the use of these funds, not the method of collecting premium payments, and such added requirements fall outside of the agency's authority.  Moreover, the changes to the implementing regulations at § 156.280(e)(2) are related to the provision in the statute concerned with the "[e]stablishment of allocation accounts," under § 18023(b)(2)(B)(i), which is meant to ensure that premiums are segregated to pay for corresponding services.

91.     A faithful reading of Section 1303 demonstrates that Congress's principal goal was the segregation of accounts to ensure that federal funds are not used to pay for otherwise legal abortion services.  The means by which the issuer acquires these premium payments from the plan enrollee or the policy subscriber is irrelevant.

92.     HHS's Rule is contrary to the text, the history, and purpose of Section 1303, because it imposes additional requirements in a manner that plainly exceeds Section 1303's statutory authority.

**C.     The Rule is Contrary to the ACA**

93.     The Rule is in direct conflict with key provisions of the ACA.  The Rule creates unreasonable and unnecessary barriers to access healthcare coverage and unjustifiably restricts women's access to reproductive healthcare—directly undermining the ACA itself.

**1.     The Rule is Contrary to Section 1554 of the ACA**

94.     The Rule also conflicts with Section 1554, which explicitly prohibits the Secretary of HHS from promulgating "any regulation" that limits access to healthcare services.  HHS may not, unless expressly authorized in the ACA, promulgate any regulations that "(1) creates any unreasonable barriers to the ability of individuals to obtain appropriate medical care; (2) impedes timely access to health care services; … or (6) limits the availability of health care treatment for the full duration of a patient's medical needs."  42 U.S.C. §18114.  Section 1303 contains no express authorization to limit access to healthcare services, as explained above, its only function is to ensure payment for certain abortion services is appropriately segregated and tracked.

95.     This prohibition extends to any health program or activity, any part of which is receiving Federal financial assistance.  HHS has failed to examine the Rule's inconsistency with Section 1554, despite the fact that numerous commenters pointed to HHS' limitations under Section 1554.  The Rule's onerous requirements, "would clearly create new, unreasonable barriers to obtaining health care by causing people to lose insurance coverage," and thus access to actual services.  (Comments submitted by the American Civil Liberties Union (ACLU), Planned Parenthood Federation of America (PPFA), and the Attorneys General Multistate letter).  And HHS is well aware of its own limitations and statutory authority.  HHS analyzed Section 1554 in its recent rulemaking regarding the contraceptive coverage mandate—yet another regulation impacting a women-specific healthcare issue.  *See* Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 83 Fed. Reg. 57552 (Nov. 15, 2018) (to be certified as 29 C.F.R. Pt. 2590).  HHS has a basic obligation to examine its legal authority to act.  *See Sierra Club v. Pruitt*, 293 F.Supp.3d 1050, 1061 (N.D. Cal. 2018) (rejecting agency's waiver argument where agency was presented with sufficient challenges to its behavior and still failed to fulfill its "obligation to examine its own authority").

### 2.     The Rule is Contrary to the Section 1557 of the ACA

96.     The Rule is similarly in conflict with, and undermines, the anti-discrimination protections provided by the ACA.  The ACA is the first federal law to prohibit discrimination, setting forth in Section 1557 a clear prohibition against discrimination in a broad range of health programs and activities, against individuals on the basis of any classification listed under four

28

different federal civil rights statutes, including Title VI of the Civil Rights Act of 1964 (race, color, national origin, and sex), and Title IX of the Education Amendments of 1972 (sex). 42 U.S.C. § 18116. Section 1557 seeks to advance healthcare outcomes and reduce health disparities by protecting groups vulnerable to discrimination in the healthcare context, including women.

97.     HHS's Rule discriminates against women by imposing unnecessary burdens and challenges to obtaining a healthcare service unique to women—abortion. Section 1303 authorizes issuers participating in the ACA's health insurance exchange to choose whether to offer abortion in qualified health plans. HHS recognizes, as it must, that coverage for abortion is utilized and sought out only by women, as it is "women who may *ultimately access* such services." 84 Fed. Reg. 71,694 (emphasis added). HHS does not deny the disparate impact the Rule will have on women, since women are more likely the enrollees who "would be most likely to intentionally enroll in a [qualified health plan] with [abortion] coverage." *Id*. at 71, 695.

98.     Unilaterally increasing the barriers to access healthcare services by targeting qualified health plans with healthcare benefits accessed only by women is discriminatory. If the Rule is implemented, men who are enrolled in qualified health plans that do not offer abortion and are not subject to separate abortion billing requirements, may continue to access the full range of healthcare services available to them without risk of confusion, delay, and ultimate denial of services because of this Rule's statutorily unauthorized administrative requirements. In contrast, women will be exposed to increased barriers to access to care, which ultimately will result in greater health risks to some women, who, without full abortion coverage, are subjected involuntarily to the increased health risks of pregnancy (discussed in detail in *Subsection F(6)*).

   **D.     The Rule's Unnecessary Changes Require Extreme Costs**

99.     While HHS updated the cost estimates in the final Rule, it failed to meaningfully consider the weight of this burden on the States, issuers, and consumers. In doing so, HHS discounted commenters' serious concerns about the Rule's costs and impacts. On December 9, 2019, the States of California and Oregon met with the Office of Management and Budget to reiterate the significant financial burden the Rule would cause on the states and the issuers that

several states previously raised in comments.[8]  California and Oregon requested that HHS accurately label the Rule "economically significant," thereby requiring the agency to perform an appropriate cost-benefit analysis and assess the costs and benefits of "reasonably feasible alternatives" to the proposal, because, among other impacts, the Rule clearly has an effect on the economy of far more than $100 million in any single year.  *See* Exec. Order 12866 §3(f); 58 Fed. Reg. 51,735 (Oct. 4, 1993).  Still, HHS's insistence that the Rule only clarifies the statute and does not directly impose *new* requirements is contradicted by the cost-benefit analysis HHS was forced to update "for accuracy" after numerous commenters showed that the agency greatly underestimated its burdens.  The updated analysis, reflects that an unreasonable amount of money is required to implement these changes.  *See generally* 84 Fed. Reg. 71,698.

100.    The Rule's impact reaches multiple states and millions of enrollees.  The Rule itself estimates that in 12 state-based exchanges alone, 71 qualified health plan issuers will offer 1,129 plans that include abortion coverage and will be subject to the Rule.  84 Fed. Reg. 71,696.  To become compliant, issuers will need to take several steps, including but not limited to, restructuring budgets, planning, contracting, building IT-systems, creating billing-related outreach, and providing new call center training.

101.    HHS estimates that one-time costs to bring all affected issuers (94 total) across the country into compliance and implement the technical changes required would cost $2.7 million per issuer.  Moreover, HHS's unreasonable push to accomplish this billing change in only six months, during the middle of the plan year, would cost each issuer about $4.1 million in higher contracting costs for system changes and overtime personnel payments.  This would bring the total one-time costs for all 94 issuers to $385 million.  84 Fed. Reg. 71,697.

102.    In addition to hefty one-time costs, there are substantial ongoing annual costs.  For instance, issuers must absorb economic burdens from hiring additional personnel, enrollee outreach, billing accuracy and reconciliation processes, quality assurance, and recordkeeping.  By

---

[8] *See* Office of Information and Regulatory Affairs, EO 12866 Meetings Dashboard, https://www.reginfo.gov/public/do/viewEO12866Meeting?viewRule=true&rin=0938-AT53&meetingId=4927&acronym=0938-HHS/CMS.

HHS's own estimate, this would cost approximate $1.07 million per issuer.  The annual burden for all impacted issuers would reach about $100.2 million.  *Id*. at 71,698.

103.    To accomplish its Rule, HHS estimates that, on average, annual materials and printing costs for all issuers sending paper bills to the 2.6 million enrollees over three years alone (2020 to 2022), would be approximately $887,721—not counting the costs associated with electronic transactions and IT changes.[9]  *Id.* at 71,699.

104.    The costs to state exchanges are equally alarming.  The Rule estimates that on average, each state exchange, will incur in 2020 one-time costs of $750,000, and ongoing annual costs of approximately $200,000 for the six months of implementation in 2020, and $400,000 in 2021—costs HHS anticipates will decrease in following years.  *Id.* at 71,705.  The total ongoing costs for all 12 state-based exchanges that permit the sale of qualified health plans offering abortion coverage is expected to be $2.4 million in 2020 alone.  *Id.*

105.    HHS itself acknowledges, that compliance with the Rule could force issuers to (a) drop coverage of abortion altogether, (b) absorb excessive costs themselves in states that require coverage by law or policy (such as Plaintiff States of California, Maine, New York, Oregon, and Vermont), or (c) pass on these costs to consumers in the form of increased premiums.  In fact, in the preamble of the Rule, HHS states that, "[s]ubject to applicable state law, it is ultimately at the issuer's discretion whether to cover…abortion services in their [qualified health plans], and thus to incur any associated burden" imposed by the Rule.  84 Fed. Reg. 71,688.  And while HHS recognizes that these changes have the potential to increase out-of-pocket costs for enrollees seeking abortion services or in effect leave enrollees without healthcare coverage, HHS fails to fully account for these costs to consumers, the impact on women specifically, and by extension, the harms to the States' public health and increased costs to their fiscs.

106.    Notably, HHS admitted that maintaining the status quo would promote stability for issuers and the evolving exchanges.  84 Fed. Reg. 71,708.  However, choosing instead to pursue

---

[9] This cost assumes that more consumers will increasingly opt to receive electronic bills over time, e.g., 90 percent in 2020, 88 percent in 2021, and 86 percent in 2022.

its stated purpose to "better align" the Rule with Section 1303, HHS declined to withdraw its proposals.

107.    HHS instead purports to consider alternatives to the final Rule, though it is clear that they did not meaningfully consider these alternate options.  The Rule runs through several options that are as unreasonable as the final Rule.

108.    First, HHS considered eliminating the requirement that issuers must provide instruction to consumers who fail to make payments separately, but concluded that consumer education is important to achieve better alignment with section 1303.  *Id.* at 71,708.  However, this option lacks common sense, because while issuers are required to spend additional resources tracking down consumers who mistakenly fail to pay the two bills in separate transactions, policy holders are free to continue paying their premiums in a single transaction.

109.    Second, the agency admits to having considered further expediting the effective implementation of the Rule, up three months from the date of publication, increasing one-time costs by 100% and driving up total estimated costs for issuers, exchanges, and consumers, up to $740 million in 2020.  *Id.*  But considering an alternative that exorbitantly increases the costs and burdens for all parties involved, such that in relation it seemingly makes the initial proposal's costs seem modest by comparison, is hardly representative a viable option.  Particularly given the agencies last and final consideration, which concerned the proposed rule's excessive costs.

110.    In this final alternative, HHS claims to have considered following through with the separate mailing requirement (requiring two envelopes) as initially proposed.  *Id.*  HHS calculates that after updating its deep underestimation of the costs of requiring issuers to send separate envelopes, the costs would have been resulted in an additional $11 million in 2021 for all issuers.  *Id.*  However, this alternative only scratches at the surface of the excessive costs that the Rule itself estimates compliance will require.  To say HHS "mitigated" the costs by eliminating the two-envelope mailing requirement does little to acknowledge the serious problems with the excessive cost of this unnecessary Rule, particularly when as finalized, the total one-time costs for all 94 issuers reaches $385 million, and the annual ongoing burdens $100.2 million.  *Id.* at 71,697-698.

111.     However, without any evidentiary support at all, HHS decided that "better alignment" with HHS's new, and unsupported, interpretation of Section 1303 simply outweighs the Rule's drastic costs and financial burdens described above.

112.     The Rule never discusses or considers attainable alternatives that target the primary purpose of the statute.  For example, there is no discussion or consideration of the verification requirements or processes currently in effect.  Nor is there any discussion of the account segregation plans submitted and reported by issuers to state regulators that certify the back-end reconciliation and verification of the abortion billing process and segregation of funds.  Judicious rulemaking would have at a minimum addressed the relevant transactions that already occur after abortion services are obtained, including the maintenance of the plans' segregated accounts, to provide assurance that issuers pay for abortion services with segregated funds that do not include federal subsidies.

### E.     The Rule is Illogical and the Final Modifications Cannot Cure its Deficiencies

113.     The Rule is illogical because it fails to accomplish HHS's purported goal.  The Rule's changes do nothing to achieve HHS's stated objective of compelling consumers to pay separate bills.  While the Rule requires that issuers send out separate bills (either in one envelope or two electronic transmissions), consumers who are policy holders are seemingly free to ignore the Rule and continue to pay a monthly bill in a single transaction.  Specifically, the final Rule requires that issuers must instruct policy holders to pay each bill through separate transactions, but are prohibited from refusing a combined payment, and cannot initiate either a grace period or terminate the policy holder's coverage on the basis that the policy holder did not send two separate payments as requested by the issuer.  § 156.280(e)(2)(ii)(B); 84 Fed. Reg. 71,685.

114.     As HHS itself acknowledges, it is common and likely for a policy holder to pay one payment, rather than two payments.  HHS agrees that requiring two payments could, in spite of expensive and "fulsome outreach and education efforts to explain the billing scheme to the policy holder, consumer confusion could still lead to inadvertent coverage losses." *Id.* at 71,686.

115.     These problematic features of the Rule not only demonstrate inadequate rulemaking considerations and capricious rulemaking, but its unworkability further provides evidence that Congress did not intend for these burdens to result by instructing how issuers should collect separate—physical or transactional—payments from policy holders.  Rather, Congress wanted to ensure that issuers placed payments in segregated accounts and did not use federal subsidies to pay for abortion services.

116.     Even the final Rule's modifications underscore the senselessness of the new billing requirements.  For example, the final Rule eliminated the excessive mailing costs (estimated by HHS at $11 million) by allowing issuers to send separate monthly bills in one single envelope to each policy holder, as opposed to the previous proposal of separate bills in two separate envelopes.  This change was made despite the position taken in the proposed regulation, that sending two separate bills will reduce consumer confusion because consumers may "inadvertently miss or discard a second paper bill included in a single envelope."  Patient Protection and Affordable Care Act; Exchange Program Integrity, 83 Fed. Reg. 10750, at 56023 (Nov. 9, 2018).  However, issuers must still send separate monthly bills when transmitting bills through email or other electronic means.

117.     The final Rule's modification—now allowing single envelope mailing—still largely ignores the evidence before HHS.  This includes comments submitted by, among others, Blue Shield of California, Covered California, Access Health CT, and the District of Columbia' Health Benefit Exchange Authority pointing to the excessive administrative costs—beyond its mailing burdens—that are associated with redesigning billing systems, processing invoices and "binder payments" for new enrollments, and additional customer service support required to facilitate these changes.  All of these expenses will likely lead to increased premiums for consumers.  And despite inserting language notifying policy holders they will receive a separate email with another bill, the separate email might more easily be missed by policy subscribers clearing their inbox believing they have already paid their premium.

118.     Moreover, the Rule fails to quantify—at all—the disproportionate costs and personal burdens that will befall policy holders, States' low-income and rural residents who do not have

34

easy access to the internet (raised by comments submitted by the National Women's Law Center), or do not have active checking accounts, debit and credit cards. In light of these circumstances, other preferences for hard mail communication, and despite encouragement to "opt into email as… [the method of] preferred communication … 70% of enrollees continue to receive communications via standard mail" in California alone. (Comments to Proposed Rule submitted by Covered California). HHS itself estimates that approximately 90% of policy holders will receive paper bills in 2020. 84 Fed. Reg. 71,699. HHS claims to "understand that many enrollees face barriers to accessing the internet and have little choice but to receive paper bills," yet it fails to consider the resulting costs to low-income individuals. *Id.* Specifically, the Rule does not fully account for the increased personal administrative expense to enrollees. *Id.* at 71,706-707 (only addressing the costs to "read and understand the separate bills received.").

119. These problematic features of the Rule demonstrate inadequate rulemaking considerations and resulting in capricious agency action.

**F.      HHS Failed to Consider Key Problems with the Proposed Rule**

120. HHS ignored numerous comments from individuals, states, issuers, and private organizations that warned against complicating the administrative burdens already imposed on the healthcare markets and exchanges and the potential for those burdens to result in harm to the states' fiscs, consumers, and public health.

**1.      The Rule Illegally Imposes Administrative Burden on the States' Regulators by Penalizing Issuers for Offering Abortion Coverage**

121. Defendant's Rule penalizes issuers for doing business in the States. The Rule's excessive regulatory burdens unfairly and disproportionately target the States that choose to invest in women's access to comprehensive healthcare, particularly in Plaintiff States that mandate or allow health plans to cover abortion services as part of the essential health benefits. By extension, the Rule seeks to further disincentivize issuers from providing abortion coverage in those states that do not yet have specific laws restricting it, by creating barriers to doing so.

122. While the Rule creates onerous requirements for issuers to abide by, these changes contemplate and necessarily demand from the States' equally burdensome and costly adjustments

35

to the way in which the States' regulate their health insurance markets and administer their health exchanges.  To comply and respond to the changes issuers are subject to, the States will have to make unnecessary structural changes that only add administrative costs and divert funds from other critical aspects of the States' insurance market and exchange operations.

123.     To begin, the Rule will add unnecessary burdens requiring issuers to expend time and money to alter budgets and allocate resources for the technical build of their systems.  Issuers will need to account for various changes, including changes to enrollment processes; generating multiple billing statements; automating separate invoices (mail or electronic communication); adding electronic communications and payment links; processing separate payment collections; restructuring response processes and call center training; conducting billing-related outreach and interactive voice response (IVR) technology; updating enrollee notifications related to non-payment and grace periods; updating Health Insurance Casework System (HICS) and Department of Insurance (DOI) complaint processes; restructuring grievance/appeals processes; and conduct testing to ensure billing accuracy.  This long list of added burdens will likely cause issuers to spend more in resources to deal with the resulting consumer confusion from multiple bills, missed payments, system errors, and delinquent notices.  But these changes are not appropriate, economically sound, or necessary.

124.     Therefore, if implemented, the Rule will place participating issuers in the difficult position of having to comply with state laws that require or allow abortion coverage by absorbing significant costs and passing these costs on to consumers in the form of increased premiums, dropping abortion coverage in states without an abortion coverage mandate, or leaving the insurance market altogether.  Any increase in premiums risks denying consumers—who cannot afford the premium increase—critical health coverage.  And the same could result if issuers choose to drop coverage or leave the state due to the cost of offering abortion coverage under this Rule.

125.     In addition, responding to these changes required by the Rule also places the States' in a bind.  For example, to be able to bill separately, some issuers like Blue Shield in California, will need to issue two separate insurance policies per enrollee, one exclusively for coverage of

36

1  abortion services, and another for coverage of the remaining health benefits.  Covered California,

2  the state's exchange, cannot accommodate this need for separate transactions, because state law

3  mandates that all insurance policies they produce include abortion coverage in a *single policy*.

4  *See* Cal. Health & Safety Code §1340 *et seq*.  To comply then, the Rule will force Blue Shield to

5  absorb the costs of the structural changes discussed above, and will incur additional costs for its

6  weekly and monthly reconciliation of separate insurance billings with Covered California's single

7  policies.  The Rule would impose these unreasonable requirements despite the fact that all issuers

8  already comply with section 1303's segregation requirements.

9      126.    Moreover, under the Rule, the separate billing and separate payment requirements

10  will also increase the administrative costs of the States' insurance regulators.

11      127.    In California, Department of Managed Health Care (DMHC) and the California

12  Department of Insurance (CDI), are two of the state agencies that regulate health insurance plans.

13  DMHC primarily regulates health maintenance organizations (HMOs), while CDI has jurisdiction

14  over traditional health insurance.  In California, issuers already submit to these respective

15  agencies annual filings with regarding their premium segregation plans, complete with separate

16  financial accounting systems, monthly reconciliation processes, and internal controls to ensure

17  that they are in accordance with federal regulations.[10]  Every carrier does this differently, and

18  Covered California would have to work independently with the State's 11 insurance carriers to

19  determine a synchronized approach that is appropriate for both agencies.

20      128.    First, the California Department of Managed Health Care, which oversees a majority

21  of the qualified health plans impacted estimates that compliance with the new Rule will

22  unnecessarily increase the state agency's administrative burden of over one million dollars.  This

23  includes:  (1) $200,000 related to the increase in call volumes to deal with consumer complaints

24  and confusion over premium bills; (2) $150,000 for additional "segregation of funds plans" legal

25  reviews submitted by issuers; (3) $400,000 for enacting new regulatory packages clarifying

26  ─────────────

27      [10] 45 C.F.R. 156.280(e)(5)(ii).  California Dep't of Managed Health Care "segregation plan" filings:  Kaiser, Anthem, Blue Shield, Molina, Oscar, Chinese Community Health Plan, HealthNet, L.A. Care, Santa Clara County, Sharp, and Western Health Advantage (documenting

28  current compliance with segregation accounts).

safeguards and cancellation dollar thresholds for issuers; and (4) $300,000 for additional analysis required to be conducted by its Office of Plan Licensing related to issuer filings and disclosures for compliance with the Rule.  All of these costs are unnecessary, as all the plans currently comply the California's segregation policies involving abortion coverage in qualified health plans.

129.    A second impacted California regulator is the California Department of Insurance, which is the largest consumer protection agency in the state.  The department estimates the implementation of the Rule will bring about significant administrative burdens totaling about $156,390 initial costs for plan year 2020, and ongoing costs of $247,620.  These costs include: (1) $151,900 for the 2020 plan year and $141,120 in ongoing costs due to increases in call volumes to their consumer services call center (and additional full-time personnel); (2) $2,130 for consumer services training; (3) $1,233 for consumer education materials; (4) $1,127 for additional legal review of the Rule's policy changes; (5) and $106,500 in annual costs of additional hearings regarding wrongful termination of coverage that will require legal evaluation and handling.

130.    Similarly, New York State Department of Financial Services ("NYS DFS"), will face a range of administrative burdens, including having to field a significant increase in calls and other inquiries from consumers regarding the receipt of multiple bills and the requirement for separate payments for health plan premiums.  In addition, NYS DFS expects to receive calls and inquiries about the potential loss of coverage for medical services.  Consequently, NYS DFS will need to direct resources to respond to the increased number of consumer calls and inquiries related to this Rule, including but not limited to development of Q&A's for NYS DFS staff, and consumer education materials for distribution on the NYS DFS' website and potentially other outlets.

131.    In addition, NYS DFS, as New York's primary regulator of health insurance plans, will need to respond to insurers' inquiries about the Rule's effects and will be required to provide regulatory guidance on the Rule.  NYS DFS will need to devote resources to developing and implementing circular letters and other forms of guidance for the health plan industry in New

1    York State.  Multiple stakeholder groups would be required to be convened, and staff would have

2    to be directed to oversee these groups – plans, consumers, and providers.  NYS DFS would

3    ultimately have to expend additional resources to draft and review, and finally publish a circular

4    letter.

5         132.    In the District of Columbia, the Department of Insurance, Securities and Banking

6    (DISB) protects the interests of District consumers by ensuring that insurers and individuals

7    presenting insurance products in the District are qualified, appropriately licensed, and meet and

8    act in accordance with all requirements of the insurance laws.  DISB estimates the

9    implementation of the Rule will bring about significant administrative burdens and costs, which

10   include: (1) an increase in call volume and AskTheCommissioner email requests about the Rule;

11   (2) an increase in formal complaints to DISB's Consumer Services Division; (3) an increase in

12   operational costs associated with training the Consumer Services Division and Forms Examiners;

13   and (4) an increase in costs for drafting and distributing consumer education materials.

14        133.    Maine operates a Federally-facilitated Marketplace (FFM) and conducts plan

15   management activities to support certification of qualified health plans by CMS.  Administration

16   of Maine's individual marketplace,[11] including premium billing and collection functions, is

17   handled at the federal level through the FFM and not by the State.  Maine law, however, requires

18   carriers seeking to cancel an individual health insurance policy for nonpayment of premium to

19   provide notice prior to cancellation.  Me. Rev. Stat. tit. 24-A, §2707-A; 02-031 C.M.R., Ch. 580.

20   Insurers further must provide a grace period (of 7, 10, or 31 days) for the payment of premium,

21   during which grace period the policy shall continue in force.  *Id.* § 2707.  Consumers whose

22   health insurance coverage has been cancelled without being provided the required notice or grace

23   period upon a failure to pay the separate premium contemplated by the Rule may request a

24   hearing before the Maine Superintendent of Insurance.  Me. Rev. Stat. tit. 24-A, § 229.  The

25   Rule's unique separate billing and payment requirements, nowhere comparable in any other line

26   of insurance, are likely to result in consumer confusion and result in more cancellations of

27   _____

28        [11] Discussion of Maine's marketplace refers specifically to the state's ACA individual
     marketplace for purposes of this complaint.

policies for nonpayment of premiums.  This will result in additional administrative burden and expense for Maine resulting from the regulation, oversight, and enforcement of insurer billing practices for compliance with the Rule.  In addition to the potential for increased requests for agency administrative hearings, the Bureau of Insurance Consumer Health Care Division (CHCD) inevitably will receive more consumer inquiries.  CHCD staff, under the direction of the Superintendent of Insurance, will need to consider allocating resources to develop and implement consumer outreach efforts about the separate billing and payment requirements of the Rule.

134.    In Maine, there are only three issuers participating in the individual marketplace: Anthem Healthplans of Maine, Maine Community Health Options, and Harvard Pilgrim Health Care.  The separate billing and payment requirements of the Rule will require these issuers to make structural changes to their billing and payment reconciliation processes, accounting systems, and internal controls resulting in costs that they will be forced to absorb mid-term beginning June, 2020 (insurer rates are locked-in for the one-year policy period).  Thereafter, in subsequent policy periods, these issuers must decide whether to continue absorbing these costs or to pass them on to consumers through increased premiums.  Alternatively, one or more of the three issuers could make the unfortunate decision simply to leave the state due to the uncertainty of the system impacts and increased costs of offering abortion coverage in compliance with the Rule.

135.    In Maine, this concern is not theoretical.  For example, due to the uncertainty of sufficient premium rate recovery for cost sharing reductions (CSRs) under the ACA, for plan year 2018 Anthem Maine withdrew from the Maine ACA market.  Anthem Maine's absence was temporary, and it returned to the Maine ACA market for plan years 2019 and 2020.  The prolonged departure from the market of one or more of the three remaining issuers currently offering ACA coverage in the state is a troubling prospect.  Any destabilization of the individual market resulting from the departure of one or more issuers could harm Maine consumers through higher premiums that often result from decreased competition.

136.    The Maryland Insurance Administration, which oversees all of the qualified health plans impacted by the Rules, will similarly experience an increase in administrative burden and

incur costs to ensure compliance with the new Rule and to handle an increase in consumer complaint volume.  All carriers in Maryland already submit to the Maryland Insurance Administration annual filings with respect to the premium segregation plans, complete with a reconciliation of all segregated account activity, and an annual attestation of compliance, including accounting documentation and internal controls, of the segregated account.  MIA Bulletin 13-24, Segregation of Funds for Certain Abortion Services Covered under Qualified Health Plans Sold on the Individual Exchange (July 31, 2013), https://tinyurl.com/vqvrkof.  The Maryland Insurance Administration will have to update the regulatory guidance provided to impacted carriers and update the legal reviews of the annual compliance filings.

137.    Like other State regulators, the Maryland Insurance Administration will experience an increase in costs due to an increase in call volume to their call center, complaints regarding coverage terminations, and appeals hearings contesting plan terminations.  The Maryland Insurance Administration will also incur costs to engage in consumer education about the Rule change.

138.    Oregon's insurance regulator, the Division of Financial Regulation, similarly anticipates the Rule change will result in additional administrative burdens, such as increased calls to its consumer advocacy unit.

139.    In Vermont, billing issues are a primary source of qualified health plan customer complaints.  In addition, if a customer underpays a premium payment, their plan will be cancelled after a one- to three-month grace period, unless the customer makes up the underpayment.  A customer who has been disenrolled for nonpayment generally may not re-enroll in an insurance plan until the annual open enrollment period, absent certain limited exceptions.  The confusion created by the Rule will cause customers to needlessly lose health insurance coverage, resulting in consumers facing high out-of-pocket costs for care and foregoing necessary medical treatment, including but not limited to abortion care and contraception coverage.  Vermont will receive consumer questions and complaints as a result of the confusion generated by the new rule, and expects increased administrative burdens in responding to these complaints.

140.     The administrative difficulties imposed on health plans, exchanges, and regulators demonstrate the Rule's true aim—to make it impossible for carriers to provide women full and comprehensive healthcare coverage by penalizing issuers individually, and unnecessarily disrupting the state agencies regulatory schemes.

141.     HHS admits that this Rule will significantly increase the administrative burdens for qualified health plans providing abortion coverage.  84 Fed. Reg. 71,696-97.  HHS identified the types of burdens imposed on insurance carriers, now required to invest time and resources to oversee the process of sending separate bills, review the accuracy of receipt of separate payments, process additional payments, and add functionalities to operating systems to develop new and separate automated payments.  83 Fed. Reg. at 56028.  And if carriers want to provide abortion coverage, the Rule will force companies to pay, on average, $1.07 million dollars annually to provide comprehensive healthcare to women.  *See* 84 Fed. Reg. 71,698.

142.     Once again, HHS acknowledged these costs and ignored them, setting an effective date within six months after the Rule's publication and in the middle of a plan year, with no possibility of accounting for any potential changes in costs.

143.     HHS also failed to adequately consider the impact of the significant increase in administrative costs that issuers must bear in 2020, amounts it cannot recoup in 2020 premiums, on its Medical Loss Ratio calculation.  Medical loss ratio involves the share of premiums that issuers pay on claims, with the remainder going to administrative expenses, other costs, and profits.  The ACA set the medical loss ratio as a mechanism to protect consumers from dramatic premium increases; currently the medical loss ratio threshold for the individual market is set at 80%; meaning that 80% of premium charges must be used for direct coverage of medical service costs or quality improvement expenses.  *See generally* 42 U.S.C. § 300gg-18 (LexisNexis 2019).  If issuers use less than 80% of premium charges for medical claims or quality improvement expenses (with some exceptions), issuers are required to issue rebates to consumers.  Consequently, an issuer's rise in administrative costs is an important factor in establishing premium amounts to assess whether they will be responsible for high consumer rebates.

144.     HHS suggests in the preamble that issuers would be able to use funds from the allocation account attributable to abortion premiums to cover any administrative burdens resulting from not being able to update individual market rates prior to the 2021 plan year, in order to mitigate the excessive financial consequences of the Rule discussed above.  *See id.* at 71,690. HHS plainly ignores that these funds are to be "used exclusively to pay for [abortion] *services*" not an issuer's administrative costs of providing that service.  42 U.S.C. 18023(b)(2)(C)(ii)(II) (emphasis added).  HHS not only ignores the statutory limitations assigned to the allocation account attributable to abortion premiums, but simply states that it does not anticipate that the rule will "measurably increase" medical loss ratio rebates because it believes issuers have a simple option:  "issuers would either cease offering [abortion] coverage," unless required by state law, in the plan year 2020 to avoid issuing additional medical loss ratio rebates, "or would pay for the increased administrative costs from a different revenue source," mainly the segregated account.  84 Fed. Reg. 71,704.

145.     Simply put, the Rule has been designed to penalize and discriminate against issuers participating in states requiring coverage of abortion services, and to coerce issuers in states where it is not mandated to drop such coverage altogether; there is no other plausible explanation. This in itself is capricious agency action.

### 2. The Rule Disrupts the Robust Administration of the States' Exchanges, Imposing Unnecessary Cost to Its Enrollment System

146.     The Rule's unnecessary change in abortion coverage billing will disrupt the States' administration of exchanges and cost millions of dollars to come into compliance within six months.  Compliance could require unnecessary restructuring of the exchanges, particularly those which conduct their own premium billing and collection functions, and has the potential to disrupt current and future marketing and enrollment campaigns, requiring significant allocation of resources to consumer outreach efforts for all exchanges.

147.     Covered California, California's state-based exchange, has created a robust health insurance system that provides for a competitive marketplace, and has maintained strong relationships with insurance carriers while empowering consumers to choose the plans that give

them the best value.  Its extensive investments in outreach allowed the exchange to raise

consumer awareness of the value of health insurance coverage and the availability of federal

financial assistance, through exchange subsidies.  These efforts have led to healthy enrollment

and retention rates across the California.  In fact, California's uninsured rate dropped

considerably, from 17% in 2013 to 6.8% in 2017.  Today, over 1.5 million enrollees receive

health insurance coverage purchase through the state's individual market exchange.

148.    As discussed in *Section III.D* above, the costs of implementing the new Rule on the

States' exchanges are unnecessary and ongoing.  Covered California anticipates that the Rule has

the potential to increase consumer calls to Service Centers, leading to longer wait times.  Covered

California will have to develop talking points for Service Center and contracted enrollers, such as

agents, amounting to 40 hours or personnel time and costing $1,225.  In addition, the exchange

will have to change materials educating the public on the Rule's policy changes, potentially

requiring the diversion of consumer outreach and marketing funds.  Moreover, Covered

California will need to evaluate operational changes to mitigate the Rule's adverse impacts, such

as amending the contracts with the state's health plans to prohibit them from terminating policy

holders for failing to pay the separate $1 premium.

149.    Additionally, the exchange would need to assess how best to disseminate education

and information over any required changes to binder payments made to issuers, the initial

payments made after enrollment that control whether or not a new enrollee's policy is initiated

(discussed below).  Because California law prohibits Covered California from issuing two policy

transactions (all health benefits must be included in a single policy), it is likely that the exchange

will be forced to pass on these costs to issuers participating in the Covered California exchange.

150.    The cost of implementing this Rule could risk Covered California's important annual

enrollment gains.  Covered California has fixed sums for marketing but would now need to

redirect funds to consumer outreach and education to explain the policy changes and mitigate

against consumer confusion and termination of coverage.  Covered California has adopted a

marketing, outreach, and sales budget for 2019-2020 that allocates $121 million, an increase of

1   $13.6 million from the 2018-2019 budget, and accounts for almost a third of its total operating

2   budget of $379 million.

3        151.    Marketing matters because outreach drives enrollment on and off the exchange.

4   Specifically, the marketing, outreach and sales budget of 2019-2020 includes $6.5 million for a

5   navigator program and $55 million for paid media ads, which aid in informing Californians about

6   the value of insurance and the availability of financial assistance for many, encouraging retention

7   of those already enrolled, and maintaining a favorable mix of enrollees for the health insurance

8   risk pool.  Covered California's navigator program is especially important, as it is a partnership

9   with community organizations across the state that has experience in reaching and assisting

10  California's diverse populations and has proven successful in enrolling more consumers annually.

11  Of that $55 million, $10 million has been added to the originally proposed budget for the

12  development and implementation of new creative media that will target audiences and advance

13  the effort in educating consumers about the new state subsidy and California's individual

14  mandate.  These funds are critically important and necessary, as these aggressive efforts have

15  demonstrably improved the State's coverage rates.

16       152.    Attaining compliance with HHS's new Rule by June 27, 2020 places significant

17  additional costs on the State.  For example, in January 2019, only 26% (377,700) of Covered

18  California's consumers selected email as their preferred method of communication, 49%

19  (705,000) selected mail, and about 20% have unspecified responses, which defaulted to mail as

20  the preferred method of communication.  Due to the limited number of exchange enrollees

21  subscribed to email, together with barriers many subscribers still face in accessing the internet,

22  outreach could be costlier through more aggressive mass mailing and on-the-ground marketing

23  campaigns during the mid-plan year.  This Rule would cost Covered California unnecessary

24  resources to implement, in addition to the reallocation of marketing funds that currently provide

25  critical consumer outreach that drives its success.

26       153.    New York State of Health (NYSoH), established within the New York State

27  Department of Health, is New York State's health exchange.  Like other state exchanges, NYSoH

28  forecasts a significant increase in consumer calls to its call center as a consequence of the Rule's

requirement of separate billing and payments.  Such an increase in call volume will place administrative burdens on the call center and will increase contract costs by an estimated $600,000.  NYSoH will likely be required to develop materials for call center staff to delineate how to advise consumers, and train staff to be prepared for the calls.  In addition, overly burdensome administrative requirements will drive up issuer costs, which could then be passed onto consumers in the form of higher premiums.

154.    The District of Columbia Health Benefit Exchange Authority (DC Exchange) operates the District's state-based exchange.  The DC Exchange estimates that it will incur approximately $3.93 million annually in FY20 and FY21 in costs directly related to the Rule.  Of this amount, $1.45 million is required to staff increased consumer calls to its contact center, inquiring about the separate billing and separate payment requirements, its ramifications, and how to properly make payment.  Increased staff will also be required to address increased churn and non-pay terminations resulting from consumer and carrier confusion regarding payment and application of dual payment for single policies as described in paragraph 174.  The costs associated with the increased staffing and training required of call center workers and internal staff by the DC Exchange's legal and policy staff to understand the Rule, its interactions with District law, and any new DC Exchange policies will be approximately $265,499 per year. Additionally, the marketing department must engage in a comprehensive campaign to educate consumers on the existence of the Rule, their rights, and how to avoid losing coverage.  This marketing campaign is expected to cost $1.15 million annually in FY20 and FY21 in staff and media costs.  This campaign is particularly crucial because of the District's requirement for individuals to maintain health coverage; the District needs consumers to know that the separate billing and separate payment requirements may cause them to lack coverage and thus not comply with the District's coverage requirement and may subject them to tax penalties.

155.    The anticipated increase in wrongful terminations based on carrier errors or misinformation will cost the DC Exchange an estimated $391,449 annually in FY20 and FY21 to process special enrollment period requests, reinstatements, and associated administrative appeals related to these requests.  The DC Exchange will also experience an estimated $243,937 annually

1   in FY20 and FY21 in additional expenses for enrollment transactions caused by the unnecessary

2   disenrollment and re-enrollment churning caused by the Rule.

3       156.    In order to comply with the Rule by June 27, 2020, the DC Exchange will need to

4   engage in off-cycle review of carrier notices and plan documentation, which normally only occurs

5   at annual plan re-certification.  The separate billing and payment requirements are new

6   requirements that must be reviewed annually, making it an ongoing expense for the DC

7   Exchange's plan management team.  These burdens will increase costs for the DC Exchange by

8   an estimated $78,412 annually in FY20 and FY21.  Beyond the new federal requirements on

9   issuer certification, the DC Exchange is likely to develop new policies, either on its own or in

10  conjunction with the District of Columbia Council and District of Columbia Department of

11  Insurance, Securities, and Banking, in an attempt to mitigate the negative effects of the Rule.  The

12  DC Exchange's executive, legal, and policy staff time associated with this work is expected to

13  cost approximately $185,541 annually in FY20 and FY21.

14      157.    The Maryland Health Benefit Exchange, Maryland's state-based exchange has,

15  through innovation and accomplishment, created a robust marketplace that offers Marylanders

16  affordable and comprehensive health insurance options.  As a result of a State reinsurance

17  program, individual market premiums decreased by an average of 13% in 2019 and another 10%

18  for 2020.  MHBE's extensive investments in technology through its website, mobile application

19  and call center, and in outreach and marketing to consumers have led to healthy enrollment and

20  retention rates in Maryland, increasing the State insured rate to 94% in 2019.[12]

21      158.    The Maryland Health Benefit Exchange anticipates that it will incur significant cost

22  increases as a result of the Rule, including at a minimum, one-time costs of $16,000 to staff a

23  special stakeholder workgroup to determine how best to educate consumers, consumer assistance

24  workers and others about the Rule's premium billing and payment changes.  The costs of

25  effectuating the educational plan have yet to be determined.  MHBE anticipates it will incur

26  $240,000 in annual costs to handle the increase in call volume to its customer service call center

27  _____

28      [12] https://www.marylandhbe.com/wp-
    content/uploads/2019/MHC_Annual_Report%202019.pdf

regarding the billing and payment changes and foreseeable plan terminations.  MHBE is currently assessing the costs it will incur to handle the increased complaint volume to its Appeals and Constituent Services department by consumers who have questions or concerns about the billing and payment changes, or whose plans are terminated for premium nonpayment - and the increase in hearings contesting the terminations.

159.    MHBE's marketing and outreach efforts will be impacted by the Rule.  Marketing and outreach drives enrollment on and off the exchange. MHBE has fixed sums for marketing but will need to redirect funds to explain the Rule's policy changes and to mitigate against consumer confusion and termination of coverage.  MHBE's marketing and outreach budget for fiscal year 2020 includes $ 3.2 million for full service communications and marketing used to inform Marylanders about the value of insurance and the availability of financial assistance for most Marylanders, encouraging retention of those already enrolled, and to maintain a favorable risk pool.  These funds are critically important and necessary for a stable marketplace.  As the budget cycle for Maryland runs July 1st through June 30th, most of the FY2020 funds have already been expended on open enrollment and there are little funds left for any new, unplanned initiative. MHBE is assessing how much of the remaining budget will need to be diverted to create and execute a marketing plan to educate consumers about how health insurance premiums, unlike any other insurance premiums, will now be billed and collected.  Attaining compliance with HHS's new Rule by June 27, 2020 significantly increases the costs.  For example, as of January 2020, 41% of MHBE's consumers selected paper mail as their preferred method of communication.  As a result, the marketing and outreach that is necessitated by the Rule change will have to be conducted through aggressive mass mailings and on-the-ground campaigns during the middle of the plan year.

160.    This Rule is likely to risk MHBE's important annual enrollment gains and put at risk market stabilization efforts made the State.  The stability of Maryland's marketplace is also tied to other factors, including renewals and the State's reinsurance program.  Renewing enrollees made up 74% of the individual qualified health plan enrollments on the Exchange for 2019 and 76% for 2020.  New enrollments become harder to acquire each year as the State continues to

1   trim its uninsured rate and the remaining uninsured population increasingly consists of the hardest

2   to reach.  Renewals are at risk by the Rule's separate billing, separate payment requirement

3   because MHBE will have to reacquire members who are terminated for nonpayment of

4   premiums.  This will significantly increase administrative costs.

5       161.    In 2018, Maryland established the State Reinsurance Program, under a State

6   Innovation Waiver, to increase premium affordability and foster stability in the individual market.

7   Because of the waiver, Maryland has experienced two successive years of double-digit premium

8   decreases, resulting in 2020 premiums that are 23% lower than 2018 premiums.  MHBE will need

9   to assess and quantify the additional costs that will be incurred to apply a new actuarial analysis

10   to the State Reinsurance Program based on a projected loss of enrollment due to foreseeable plan

11   terminations.  Because the number of enrollees determines federal pass-through dollars allocated

12   under the reinsurance program, insurance premiums, and the amount of state funding needed for

13   the State Reinsurance program, any reduction in enrollment destabilizes Maryland's reinsurance

14   funding and the marketplace as a whole.

15       162.    The Oregon Health Insurance Marketplace is State-Based Exchange on the Federal

16   Platform; the state-based health insurance marketplace is operated by the Oregon Department of

17   Consumer and Business Services (DCBS), but utilizes the federal enrollment platform,

18   Healthcare.gov.  The Oregon exchange estimates it will need one additional full time employee to

19   handle the increased call volume resulting from consumer confusion and concern over missed

20   payments.  This cost would be in the range of approximately $36,000 - $52,000 per year.

21   Production and updating marketplace consumer education materials would cost approximately

22   $1300, and the cost of distributing those consumer education materials would cost approximately

23   $23,000 per mailing.

24       163.    The Department of Vermont Health Access has performed billing functions in the

25   qualified health plan market along with issuers, but it is in the process of transitioning these

26   functions completely to the issuers for plan year 2021.  It would be operationally and financially

27   impossible for the Department of Vermont Health Access to make major changes to its billing

28   procedures at this stage.

164.     Moreover, the ACA grants states the option of performing premium collection services for the individual insurance market's sale of qualified health plans.  In states that perform all premium billing and collection functions for individual market consumers, the costs of implementing the Rule's changes will be even more significant, and similar to the costs borne by issuers in other exchanges.

165.     While HHS reconsidered the "greatly underestimated" cost analysis in the proposed regulation, and determined that the total costs to implement the Rule would reach almost $550 million in 2020 alone, the final Rule remained largely unchanged.  84 Fed. Reg. 71,699.  In effect, HHS dismissed a key aspect of the problem relating to the Rule—the excessive costs—and ultimately ignored the many commenters' concerns and *the agency's own accounting* of the unconscionably high costs of implementation.

166.     Instead, HHS reminds "states concerned about enforcement and oversight of these requirements that, under section 1321(c), states may elect not to establish and operate an Exchange, thereby deferring those responsibilities to HHS."  84 Fed. Reg. 71,694.  In fact, in the preamble, HHS assures state-based exchanges, "the Secretary may step in to enforce the requirement against the non-compliant issuer."  84 Fed. Reg. 71,692.

### 3.     The Rule Puts at Risk the State's New Coverage Gains

167.     As discussed above, the many problems with the Rule put at risk the healthcare coverage of millions of individuals already enrolled in qualified health plans, and place individuals newly enrolled in a delicate position.

168.     First, commenters explained to HHS that insurance bills, as is the case for "auto, homeowners, and liability insurance policies," have inculcated in consumers that only one bill is required for the entire premium for any set time period, and the Rule is therefore contrary to well-established industry practice.  (Comments submitted by the District of Columbia's Health Benefit Exchange).  This is a key aspect of the insurance industry, where additional invoices are generated "only if there is a late payment or a change to the policy, like adding dependents or new employees."  *Id.*  But HHS failed to even discuss the radical departure from entire industry practice.  84 Fed. Reg. 71,684.

169.    Second, Covered California, among other exchanges, submitted comments to HHS warning that the Rule would leave consumers confused by the need to pay an additional bill of a nominal amount ($1), and therefore run the risk of losing out on critical health insurance coverage due to inadvertently failing to pay the initial premium payment in full.  Specifically, new policy subscribers who have yet to make their initial "binder" payments would effectively lose their coverage before it even begins.  This is different from risks of coverage termination.

170.    As explained by Access Health CT to HHS, "[w]ithout a binder payment, an enrollment is often not effectuated by a carrier" and exchanges work aggressively "through several channels to ensure consumers understand their responsibility for making the first month's payment, and monthly payments throughout the year thereafter."  (Comments to Proposed Rule submitted by Access Health CT).  Similarly discussed in the Attorneys General comment letter, submitted on January 8, 2019, the Rule's separate billing requirements put a significant number of enrollees at risk of termination—or in other words, policy non-initiation.  But the Rule fails to consider that additional costs of updating internal operations, such as binder payment processing, will require exchanges to redirect vital funds from other programs to additional consumer outreach and marketing.  (Comments to Proposed Rule submitted by Covered California).

171.    In California, this has the potential to leave large numbers of new enrollees without coverage and risks hurting California's success in bring down uninsured rate from the historic high discussed above (from 17% in 2013 to 6.8% in 2017).  In addition, in 2018, California experienced a 3% growth in enrollment numbers, gaining 423,484 enrollees who signed up for coverage through Covered California for the first time.[13]  By 2019, Covered California reported more than 1.5 million enrollees had gained coverage on the exchange's individual market.  In addition, in 2020, more than 318,000 consumers have newly signed up for health insurance through Covered California during the current open-enrollment period (which continues through January 31), and that surpassed last year's total of 295,000 enrollees.  This is in part because new

_____

[13] News Release, Covered California (Feb. 7, 2018), https://www.coveredca.com/newsroom/news-releases/2018/02/07/Covered-California-Finishes-Fifth-Open-Enrollment-Strong-New-Sign-ups-of-423-484-up-3-Percent-Over-Last-Year/.

state law requires Californians to have health insurance in 2020 or face a penalty when they file their taxes with the Franchise Tax Board in 2021.  Under the Rule, all new enrollees would be at risk of policy non-initiation if they failed to make both billing payments on time.  Added to this are the difficulties and confusion of having to re-navigate the process for coverage re-instatement, seek additional coverage, or procure enough time and resources to secure alternative medical services in the face of an emergency.

172.    In New York, since opening in 2013, NYSoH has transformed New York's individual insurance market, offering New Yorkers access to affordable health insurance options.  NYSoH assists New Yorkers in determining whether financial assistance through federal subsidies is available.  Through offering affordable health options on its exchange, New York experienced an unprecedented increase in individual health insurance enrollment.  In just seven years — from the opening of NYSoH in 2013 to present — the rate of uninsured New Yorkers has declined from 10% to 4.7%.  There are currently 12 plans participating on NYSoH.

173.    NYSoH enrolled 253,102 individuals in a QHP (59 percent received financial assistance to lower the cost of their coverage) in January of 2018.[14]  A year later in January of 2019, the number of individuals enrolled in a QHP rose to 271,873, with more than half (58%) of those people receiving financial assistance to lower the cost of their coverage.[15]  As of January 27, 2020, there were 260,513 people enrolled in a QHP (the deadline to enroll in a QHP does not close until February 7, 2020), with approximately 60 percent receiving financial assistance.

174.    The DC's Exchange enrollment experience demonstrates that the Rule will substantially increase payment confusion issues.  In plan years 2018 and 2019, 197 special enrollment period requests requiring manual review were approved due to carrier errors, carrier misinformation, or other carrier issuers that caused plan terminations based on non-payment of premiums.  The DC Exchange anticipates the Rule will result in a 50% increase in wrongful terminations because the separate payments are not paid or applied correctly.  As described

---

[14] https://info.nystateofhealth.ny.gov/2018openenrollmentreport - NYSOH 2018 Open Enrollment Report
[15] https://info.nystateofhealth.ny.gov/2019openenrollmentreport - NYSOH 2019 Open Enrollment Report.

1    above, customers who are unable to initiate their policies would then need to seek re-instatement

2    and re-navigate the enrollment process, all the while being without coverage and experiencing the

3    stress and risk of non-coverage.  In the District's experience, a substantial portion of these

4    customers would just forego coverage once terminated.

5         175.      In Maine, the state's total individual market enrollment reached 70,987 in

6    2019.  Because the overwhelming majority of individual health plans in Maine are secured

7    through the marketplace, the Rule's separate billing and payment requirements will likely have a

8    significant adverse effect on Maine consumers.  In addition, in 2019 there were nearly 14,000

9    new enrollees.  Under the Rule, any new gains in enrollment would be at risk of termination, or

10    non-initiation, of their individual health plans if they failed to make both billing payments on

11    time.  The confusion created by the Rule's separate billing and separate payment requirements is

12    likely to result in more cancellations of policies, more questions directed to the Bureau of

13    Insurance and requests for administrative hearings, and additional administrative burden and

14    expense.

15         176.      Moreover, in 2018, CMS approved Maine's application for a State Innovation

16    Waiver, for 2019 through 2023, to run a state-based reinsurance program.  Maine's reinsurance

17    program is operated by the Maine Guaranteed Access Reinsurance Association (MGARA).  As a

18    result of the waiver approval, more consumers in Maine may have coverage, consumers will see

19    lower premiums, and the state will receive pass-through funding to help offset a substantial

20    portion of state costs for MGARA.  MGARA is expected to reduce premiums by about 9 percent

21    each year beginning in 2019.  Enrollment is expected to increase by about 1.1 percent in 2019, 0.9

22    percent in 2020, and between 0.3 to 0.8 percent after that.  Overall, Maine expects enrollment of

23    an additional 300 to 1,100 individual market enrollees annually.  MGARA will be funded by

24    multiple sources, including reinsurance premiums paid by issuers and an assessment on all health

25    coverage sold in Maine.   Because the number of enrollees determines the amount of federal

26    dollars for MGARA, insurance premiums, and the amount of state dollars needed for MGARA,

27    any reduction in enrollment in the individual market as a result of the Rule's separate billing and

28    separate payment requirements could adversely affect MGARA to the detriment of the state.

177. Maryland, in 2019, gained more than 40,000 enrollees who signed up for individual coverage through the Maryland Health Benefit Exchange ("MHBE') for the first time—all of whom would be at risk of termination if they failed to make both billing payments on time.[16] This constituted a 2.2% growth in enrollment in 2019, but would now also represent new enrollees who would be at risk of termination, or non-initiation, under the Rule.

178. In Oregon, the Oregon Health Insurance Marketplace reached a total enrollment of 148,180 for the 2019 plan year, gaining 35,617 new enrollees. As in other states, new enrollees who fail to make the premium payment in full would risk coverage non-initiation. As indicated by the numbers of new enrollees for 2019, tens of thousands of new enrollees could potentially be impacted simply because they failed to pay a nominal portion of their insurance coverage. This is at odds with Oregon's goal of comprehensive, quality health insurance for all its residents.

179. In Vermont, there are over 25,000 individuals enrolled in qualified health plans in the individual market. In 2019, there were 3,884 new enrollees who purchased qualified health plans through Vermont Health Connect. The Rule's separate billing and separate payment requirements will create customer confusion, and are likely to result in unnecessary dis-enrollments or cause new enrollees from effectuating new policies.

### 4. The Rule Will Increase Consumer Confusion, and Lead to Coverage Termination

180. The added confusion imposed by the separate billing and separate payment requirements will likely result in more consumers losing healthcare coverage entirely, as the Rule does not prohibit issuers from terminating coverage for failure to pay the separate $1 premium for abortion coverage.

181. The Rule's resulting confusion is significant because it reveals HHS's lack of due diligence and awareness of most consumers' experience with healthcare insurance. Often, consumers wary of financial deception may intentionally disregard a second bill suspecting that the bill for a nominal amount is a scam since the consumer may have already paid the first bill.

---

[16] Maryland Health Benefit Exchange, 2019 Annual Report 4, 22, https://tinyurl.com/tdrfkeo.

54

(Comment by Planned Parenthood Federation of America (citing a study reporting consumers described the separate billing process as "a scam," "super confusing," "an unnecessary hassle," "inconvenient," and "frustrating"[17]).  The frustration of failing to make sense of health insurance programs or bills can force some consumers into blindly paying excessive charges, or ignore them and risk losing coverage and incurring more debt in fees.

182.    Any loss of private healthcare coverage will harm the most vulnerable residents (as discussed above in paragraph 118), relegating the uninsured and underinsured and largely low-income communities to public services or emergency care.  Despite comments submitted by Physicians for Reproductive Health raising these facts, the final Rule failed to account for the harms incurred from any inadvertent loss of healthcare coverage, the resulting increased premiums, higher out-of-pocket and uncompensated care costs, and the rise of unintended pregnancies from loss of access to abortion services.

183.    The risk of coverage termination applies to all qualified health plan enrollees.  Under the Rule, while issuers are not required to terminate coverage for failure to pay the separate $1 bill, the Rule does not prohibit issuers from choosing to terminate the entire policy instead of spending additional resources relating to ongoing consumer outreach and debt collection.  In fact, issuers will nonetheless "still be required to collect the premium for the...abortion coverage."  84 Fed. Reg. 71,705.  And while HHS's professed reason for granting issuers the ability to implement opt out mechanisms for policy holders to modify their plans is to mitigate the risk of coverage termination, this non-enforcement policy is discretionary and not mandatory.  *Id.* at 71,706.  Thus, qualified health plans in states without abortion coverage mandates could nevertheless decide not to implement the discretionary policy, and simply choose to terminate the policy holder's coverage for having failed to pay the $1 premium.  This largely leaves the risk of termination unaltered.  Loss of coverage due to a mere billing technicality could be a matter of life or death for consumers dealing with sensitive medical procedures and ongoing treatments.

---

[17] Comment cites Motivate Design, *Usability Study on Nelson Amendment Implementation Report* (2011) (on file with Planned Parenthood Federation of America).

184.     In addition, the Rule will leave consumers—both men and women already beyond their reproductive years—more confused after they receive a separate monthly bill for abortion coverage, a health service they no longer need.  This could prompt policy subscribers, under the Rule's new opt-out discretion now afforded to some issuers, to decline the benefit of abortion coverage, without understanding that this inadvertently triggers the termination of such coverage for any other enrollees under the policy who may still require such services themselves.

### 5.     The Rule Is Contrary to State Policy, Will Increase Uncompensated Costs and Hurt the States' Fiscs

185.     As discussed above, the confusion imposed by the Rule's separate billing and separate payment requirements is likely to result in consumers losing their health coverage entirely.  Ultimately, any lapse or loss of coverage, abortion or otherwise, could result in more unplanned births, an increase in uncompensated care costs, and consumers foregoing preventative care and medically necessary but unaffordable health care.

186.     If residents in need of medically necessary care do not have insurance coverage, they will turn to state-funded public programs, such as welfare or emergency room care.  Yet, HHS wholly failed to consider the full costs and the risks that come from arbitrarily complicating or restricting access to healthcare coverage, which will undeniably costs residents and the States' fiscs.

187.     As an example, HHS's final Rule heightens the risk that women will end up without abortion coverage.  Given the costs of abortions, many of these women will not have the financial means of obtaining one, which increases the likelihood of women falling into cycles of poverty and reliance on public assistance programs.  Women whose healthcare coverage is terminated or non-initiated, and do not have knowledge, time, or resources to obtain or reinstate that coverage, will turn to state-funded programs.

188.     In California, women and individuals in need of healthcare services but left without coverage could turn to the state-funded Family Planning, Access, Care, and Treatment (Family PACT) program, or emergency care for their reproductive healthcare needs.  An increase in unplanned births due to loss of coverage will raise State costs.  In 2010, for example, 64.3% of

unplanned births in California were publicly funded.  That year, in California, the federal and state governments spent $1.8 billion on unintended pregnancies; $1.062 billion was paid by the federal government and $689.3 million was paid by the State.  In 2010, Maryland paid for 19,000 unplanned births.[18]

189.     Importantly, the Rule puts all residents are at risk of such coverage loss, which will likely further increase the hospital and the States' uncompensated care costs.  According to a recent estimate, the loss of insurance coverage and associated uncompensated costs would lead to an exorbitantly high financial loss for the States.[19]

190.     In California, between 2010 and 2015, an estimated 3,826,000 people gained coverage.  From 2019 to 2028, a rise in uninsured rates could lead to a loss of federal marketplace spending and Medicaid spending, risking $61.1 and $99.1 billion respectively—a total loss of $160.2 billion.  If California's coverage gains were put at risk, it is estimated that California hospitals could lose $64.1 billion and physicians could lose $24.7 billion.  Uncompensated care costs in California would increase by $140.1 billion over this period.

191.     Similarly, since the implementation of the Affordable Care Act the number of uninsured New Yorkers decreased by approximately 1 million.  A rise in uninsured rates due to the Rule could increase the fiscal and human costs of uncompensated care across the state.  New

---

[18] https://www.guttmacher.org/sites/default/files/factsheet/md_8_0.pdf

[19] Decl. of Henry J. Aaron in Supp. Of Mot. To Intervene, *Texas v. United States*, No. 4:18-cv-00167-O (N.D. Tex., filed Apr. 9, 2018) at 32-34, 46-48, 52-54, 56-58, 64-66.  *See also* Office of the Assistant Secretary of Planning and Evaluation, Compilation of State Data on the Affordable Care Act (Dec. 2016), https://aspe.hhs.gov/compilation-state-data-affordable-care-act. Note that some estimates are not available for all states due to small sample size; Linda J. Blumberg et al., *Implications of Partial Repeal of the ACA through Reconciliation*, Urban Inst. (Dec. 2016), https://www.urban.org/sites/default/files/publication/86236/2001013-the-implications-of-partial-repeal-of-the-aca-through-reconciliation_1.pdf; Trust for America's Health, *Updated Prevention and Public Health Fund (PPHF) State Funding Data* (FY10-FY17) (March 2018), https://www.tfah.org/health-issues/news/updated-prevention-and-public-health-fund-pphf-state-funding-data-fy10-fy17/; Ctrs. for Medicare & Medicaid Serv's, *2017 Effectuated Enrollment Snapshot* (June 2017), https://downloads.cms.gov/files/effectuated-enrollment-snapshot-report-06-12-17.pdf; Ctrs. for Medicare & Medicaid Serv's, Nearly 12 Million People with Medicare Have Saved over $26 Billion on Prescription Drugs since 2010, Press Release (Jan. 2017), https://www.cms.gov/Newsroom/MediaReleaseDatabase/Press-releases/2017-Press-releases-items/2017-01-13.html.

York hospitals have reported a dramatic decrease in self-pay hospital utilization because patients have gained insurance—a usual source of payment.  New York State Institutional Cost Reports show a 23% reduction in self-pay hospital emergency room visits, a 40% reduction in self-pay inpatient services and a 17% reduction in self-pay outpatient visits.  Having a usual source of payment for patients reduces the risk of uncompensated care costs.[20]

192.    In the District of Columbia between 2010 and 2015, an estimated 25,000 people gained coverage.  From 2019 to 2028, a rise in uninsured rates could lead to a loss of federal marketplace spending and Medicaid spending, risking $100 million and $1.7 billion respectively—a total loss of $1.7 billion.  If these gains were put at risk, it is estimated that District of Columbia hospitals could lose $700 million and physicians could lose $200 million. Uncompensated care costs in the District of Columbia would increase by $1.7 billion over this period.

193.    In Maine, from 2010 to 2018, the rate of uninsured people dropped from 11% to 8%, resulting in 37,000 fewer uninsured people – mostly attributable to the private coverage improvements in the ACA, since the consequences from the MaineCare (Medicaid ) expansion were not fully realized until 2019.  Uncompensated care costs in Maine fell by $44 million from 2013 to 2015 alone.  The number of people insured through the individual market more than doubled, rising from approximately 32,000 in 2013 to over 70,000 in 2019, according to the Maine Bureau of Insurance.  In the 2019 open enrollment period, women comprised 54 percent of people who signed up for individual coverage through HealthCare.gov in Maine.

194.    In Maryland, 156,963 residents have obtained private health insurance and more than 1,000,000 are covered by Medicaid as of 2019, cutting the overall rate of the uninsured to just 6%.[21]  Uncompensated care costs in the state decreased by an estimated $354 million from 2013

---

[20] Declaration of Dr. Howard A. Zucker ISO Motion to Intervene of State of California, et al., (18-cv-167), April 6, 2018.

[21] Maryland Health Benefit Exchange, 2019 Annual Report 4, 19, https://tinyurl.com/tdrfkeo.

to 2016.[22]  In Maryland, under current agency policy, uncompensated care for all Maryland hospitals is funded by a statewide pooling system in which regulated Maryland hospitals draw funds from the pool if they experience a greater-than-average level of uncompensated care and pay into the pool if they experience a less-than-average level of uncompensated care.  This policy ensures that the cost of uncompensated care is shared equally across all the hospitals within the system.  Thus, when uncompensated care increases, hospital rates increase accordingly, and payers must pay increased rates.

195.    Because Maryland is a payer of hospital rates, Maryland is directly injured by any increase to the uncompensated care rate that will occur if the uninsured population in Maryland increases.  And, any increase in hospital rates will undermine and put at risk Maryland's unique Total Cost of Care Model Agreement with CMS, an Agreement to achieve fixed amounts of savings to Medicare per capita total cost of care during each model year between 2019 and 2023. The Models financial targets are structured to obtain a total of over $1 billion in Medicare total cost of care savings by the fifth performance year of the Model.

196.    In Oregon, between 2010 and 2015, an estimated 403,000 people gained coverage. From 2019 to 2028, a rise in uninsured rates could lead to a loss of federal marketplace spending and Medicaid spending, risking $3.3 and $35.1 billion respectively—a total loss of $38.4 billion. If these gains were put at risk, it is estimated that Oregon hospitals could lose $17.5 billion and physicians could lose $5.7 billion.  Uncompensated care costs in Oregon would increase by $15.2 billion over this period.

197.    In Vermont, between 2010 and 2015, an estimated 26,000 people gained coverage. From 2019 to 2028, a rise in uninsured rates could lead to a loss of federal marketplace spending and Medicaid spending, risking $1 and $1.9 billion respectively—a total loss of $2.9 billion.  If these gains were put at risk, it is estimated that Vermont hospitals could lose $500 million and

---

[22] Matt Broadus, *ACA Medicaid Expansion Drove Large Drop in Uncompensated Care*, Ctr. on Budget and Policy Priorities (Nov. 9, 2019), https://www.cbpp.org/blog/aca-medicaid-expansion-drove-large-drop-in-uncompensated-care.

physicians could lose $300 million. Uncompensated care costs in Vermont would increase by $2.4 billion over this period.

### 6. The Rule Harms Women and Creates Unreasonable Burdens on Abortion Care

198. Indisputably, the Rule disproportionally impacts the States, which are committed to protecting women's access to the full range of reproduction options and allow or require qualified health plans to include abortion coverage as part of the qualified health plan's benefits.

199. The Rule primarily seeks to create barriers to access to women's healthcare by targeting coverage of a service unique to women—and protected by federal and state laws— abortion care.

200. While the Rule directs issuers to separately bill policy holders without regard to sex, abortion coverage and services are unique to women's reproductive health. 84 Fed. Reg. 71,694. Contrary to nondiscrimination protections provided by the ACA, the Rule has a disparate impact on women because it conditions their access to comprehensive reproductive healthcare on the onerous regulatory burdens requiring separate billing and payments and seeks to eliminate legal abortion coverage entirely in states that do not require it.

201. As discussed in *Subsection F(4)* above, the Rule creates unnecessary confusion, and if separate bills are not paid at the onset of enrollment, women run the risk of being left without any coverage at all. Failing to comply with the Rule impacts women differently than men.

202. The risk of losing coverage of abortion services naturally falls heaviest on women who may require it, potentially resulting in irreversible harm in the form of delayed care, unintended pregnancies, or health complications. Without insurance coverage, a woman must procure the necessary funding to cover the out-of-pocket expenses in time to obtain a needed abortion, placing unreasonable obstacles in her attempt to exercise a legal right.

203. For example, if an issuer terminates a woman's healthcare coverage when she requires abortion services, a time-sensitive matter, she would find herself in the difficult position of having to pay out-of-pocket or endure additional risk while attempting to secure alternative coverage, which may or may not be available. Ultimately, delays in reaching and obtaining care

1   can push women later into their pregnancies, even up to the point that they might not be able to

2   obtain a wanted abortion, depending on the gestational limits on abortion in their state.[23]  Those

3   forced to delay abortion care often experience negative mental health outcomes, and consider

4   ending the pregnancy on their own, either with medications (misoprostol, herbs or home

5   remedies) or by blunt-force physical trauma.[24]

6       204.    HHS is aware the Rule's risk of coverage loss could leave women to pay higher out-

7   of-pocket costs for abortion care.  84 Fed. Reg. 71,705.  HHS also received many comments

8   expressing "concern that when legal abortion becomes inaccessible, women who seek to end their

9   pregnancy turn to unsafe and illegal methods, risking arrest, serious injury, or even death." *Id.*

10  But HHS simply concludes that "any additional burden these enrollees experience related to

11  understanding" the Rule or inadvertently failing to submit payments in full due to confusion, "is

12  unrelated to whether [enrollees] actually do access coverage" for abortion services.  *Id.* at 71,695.

13  HHS's statement fails to meaningfully consider to the pivotal importance of healthcare coverage

14  that enables women to obtain lawful, necessary healthcare services—and in this case—for women

15  to exercise their constitutionally protected right to abortion.  HHS even disregards commenters

16  who stressed, in their professional opinion, that access to comprehensive reproductive healthcare

17  "is one of the few means of regaining self-esteem and a sense of bodily autonomy" for women

18  experiencing partner abuse, reproductive coercion, and sexual assault.  (Comment submitted by

19  University of California, Irvine, School of Nursing, Assistant Professor Candace W. Burton, RN,

20  PhD on Proposed Rule).

21      205.    This unnecessary burden applies to no other healthcare service or benefit.  The Rule's

22  sole function is to make it more burdensome and more confusing for women to pay for health

23  plans that include legal abortion services, and frustrate the receipt of such coverage in states that

24  require or allow it.  Further, for many women, access to a health plan that includes abortion

25

26  [23] Alice Cartwright et al., *Identifying National Availability of Abortion Care and Distance from Major US Cities: Systematic Online Search* (2018), https://www.jmir.org/2018/5/e186/.

27  [24] Jenna Jerman et al., *Barriers to Abortion Care and Their Consequences for Patients Traveling for Services: Qualitative Findings from Two States*, Perspectives on Sexual and

28  Reproductive Health (2017), https://onlinelibrary.wiley.com/doi/full/10.1363/psrh.12024.

coverage is a necessary antecedent to the ability to exercise the legal right to obtain the procedure. Forcing women to adapt to onerous and nonsensical billing practices in order to maintain abortion coverage is discriminatory.

206.    The receipt of separate monthly bills, and the costs and labor of having to submit or mail separate payments for abortion coverage is plainly unnecessary, and only serves to remind women that their constitutional right to abortion services is one that is heavily regulated.  This can potentially stigmatize abortion and shame women for exercising their constitutional right to choose when and whether to become mothers.  Women forced to carry an unwanted pregnancy to term risk postpartum hemorrhage and eclampsia, and report a need to limit physical activity for a period three times longer than women who obtain abortions.[25]  Women unable to plan pregnancies and who have pregnancies too close together face an increased health risks, such as premature birth, low birth weight, congenital disorders, and schizophrenia.[26]  Carrying an unwanted pregnancy to term can also result in a greater risk of domestic violence.[27]

207.    Importantly, communities of color are most harmed when abortion access is undermined.  (*See* comments submitted by the Public Health and Insurance Committee of the Connecticut General Assembly, California Latinas for Reproductive Justice (CLRJ), and PPFA on Proposed Rule ).  The Rule has failed to consider the disproportionate effect these changes will have on women with limited incomes, women of color, those with limited English proficiency and people in states where abortion is not required.

208.    It has been well documented that low-income women who lack insurance coverage for abortion often struggle to pay for the procedure out-of-pocket, and these same financial

---

[25] Caitlin Gerdts et al., *Side Effects, Physical Health Consequences, and Mortality Associated with Abortion and Birth after an Unwanted Pregnancy*, 26 Women's Health Issues 55, 58 (2016), https://www.sciencedirect.com/science/article /pii/S1049386715001589.
[26] *Family Planning: Get the Facts About Pregnancy Spacing*, Mayo Clinic, https://www.mayoclinic.org/healthy-lifestyle/getting-pregnant/in-depth/family-planning/art-20044072.
[27] Sarah C.M. Roberts et al., *Risk of Violence from the Man Involved in the Pregnancy after Receiving or Being Denied an Abortion*, 12:144 BMC Medicine at 5 (2014), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4182793/.

hardships drive families further into poverty. Abortion procedures are expensive, costing on average between $500 and $1,500. And most enrollees obtaining advanced premium tax credits or cost-sharing reductions, already have limited incomes—which is often a requirement to meet eligibility thresholds.

209. Lack of access to abortion also results in poorer socioeconomic outcomes, including lower rates of full-time employment and increased reliance on public programs.[28] Conversely, increased availability of abortion results in *increased* women's participation in the workforce, especially for women of color.[29] As the Supreme Court recognized, women's control of their reproductive healthcare ensures that they can participate "equally in the economic and social life of the Nation." *Casey*, 505 U.S. at 856; *see also Priests for Life v. U.S. Dep't of Health and Human Services*, 808 F.3d 1, 22-23 (2015) (Kavanaugh, J., dissenting) ("It is commonly accepted that reducing the number of unintended pregnancies would further women's health, advance women's personal and professional opportunities, reduce the number of abortions, and help break a cycle of poverty."). Ultimately, women who want an abortion but are unable to afford one without insurance coverage are more likely to spend years living in poverty than women who are able to receive an abortion.

210. Control over family planning and reproductive healthcare are fundamental to gender equality and women's empowerment, as it is a key driver in reducing poverty. Thus, restrictions that prevent women from obtaining abortion coverage can have negative lifelong consequences, resulting in reductions in full-time employment, limited educational opportunities, and increased incidences of poverty.[30]

211. The potential impacts of the Rule, namely the loss of healthcare coverage and having to carry an unwanted pregnancy to term, accentuate the struggles already present for women

---

[28] Diana Greene Foster et al., *Socioeconomic Outcomes of Women Who Receive and Women Who are Denied Wanted Abortions in the United States*, 103 Am. J. Pub. Health 407, 409 (2018), https://www.ncbi.nlm.nih.gov/pmc/ articles/PMC5803812/.

[29] *See* Anna Bernstein et al., *The Economic Effects of Abortion Access: A Review of the Evidence*, Ctr. for Economics of Reproductive Health, Institute for Women's Policy Research (2019), at v., https://iwpr.org/wp-content/uploads/2019/07/B379_Abortion-Access_rfinal.pdf.

[30] *Supra* Foster et al.

across the Nation, and run contrary to the States' efforts to safeguard women's reproductive freedom.

**FIRST CAUSE OF ACTION**

**(Violation of APA; 5 U.S.C. § 706—Exceeds Statutory Authority)**

212.     Plaintiffs re-allege and incorporate the foregoing paragraphs as if set forth in full.

213.     The APA requires courts to "hold unlawful and set aside" agency action that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(C).

214.     The Rule exceeds Defendants' authority under Section 1303, which prohibits the use of federal subsidies to pay for abortion coverage and services, not the collection of a single payment or the use of a single billing statement.

215.      The Rule creates a significant change in policy that cannot be reconciled with the text and purpose of Section 1303, the authorizing statute.

216.     Defendants illegally attempt to redefine subsections of the statute, expanding the requirement for the collection of separate payments and injecting new notice requirements that are directly contrary to the limitations in Section 1303.

217.     By promulgating this Rule, Defendants have acted in excess of their authority granted to them by the ACA.  In doing so, Defendants have taken action in violation of the APA.  The Rule is therefore invalid.

**SECOND CAUSE OF ACTION**

**(Violation of APA; 5 U.S.C. § 706(2)(A)—Contrary to Law)**

218.     Plaintiffs re-allege and incorporate the foregoing paragraphs as if set forth in full.

219.     The APA requires courts to "hold unlawful and set aside" agency action that is "not in accordance with law."  5 U.S.C. § 706(2)(A).

220.     The Rule conflicts with Section 1554 of the Affordable Care Act, which prohibits the Secretary of HHS from promulgating any regulation that limits access to healthcare services.   42 U.S.C. § 18114.  Among other key provisions, Section 1554 prohibits agency actions that (1)

64

1    unreasonably inhibit access to "appropriate medical care;" (2) prevent "timely" access to care; or

2    (3) would prevent a patient from obtaining treatment "for the full duration of [their] medical

3    needs." *Id*.

4          221.    As addressed previously, the Rule's separate abortion billing and collection

5    requirements leave everyone at risk of coverage termination and will unreasonably inhibit access

6    to appropriate and timely medical care, including abortion, in violation of Section 1554.

7          222.    Additionally, the Rule is also in direct conflict with Section 1557 of the ACA, which

8    provides anti-discrimination protections in health programs based on any ground listed under four

9    different federal civil rights statutes, including Title VI of the Civil Rights Act of 1964 (race,

10    color, national origin, and sex), including sex under Title IX of the Education Amendments of

11    1972.  42 U.S.C. § 18116.

12          223.    Defendants' Rule specifically targets a healthcare service unique to women—

13    abortion.  HHS recognizes, as it must, that coverage for abortion services is primarily sought by

14    "women who may ultimately access such services."  84 Fed. Reg. 71,694.  The Rule, if

15    implemented, will result in a disparate impact on women's access to comprehensive medical care.

16          224.    The likely impact of this Rule is the loss of insurance coverage, which will lead to

17    increased healthcare costs for consumers that no longer have insurance.  This is in complete

18    contravention of the widely recognized core purposes of the ACA, which are to "increase the

19    number of Americans covered by health insurance and decrease the cost of health care".  *Nat'l*

20    *Fed'n Indep. Bus. v. Sebelius*, 567 U.S. 519, 538 (2012).

21          225.    By promulgating this Rule, Defendants have acted contrary to the Affordable Care

22    Act in violation of the APA.  The Rule is therefore invalid.

23                                    **THIRD CAUSE OF ACTION**

24          **(Violation of APA; 5 U.S.C. § 706—Arbitrary, Capricious, and Abuse of Discretion)**

25          226.    Plaintiffs re-allege and incorporate the foregoing paragraphs as if set forth in full.

26          227.    The APA requires courts to "hold unlawful and set aside" agency action that is

27    "arbitrary, capricious, [or] an abuse of discretion…." 5 U.S.C. § 706(2)(A).

28

228.     In issuing the Rule, Defendants have failed to provide a "satisfactory explanation" and "rational connection between the facts found and the choice made." *Motor Veh. Mfrs. Ass'n v. State Farm Ins.*, 463 U.S. 29, 42 (1983).

229.     Defendants ignored critical impacts of the Rule as a whole that the States and others raised in public comments.  Defendants have offered an explanation for their decision that "runs counter to the evidence before the agency" and is "so implausible that it could not be ascribed to a difference of view or the product of agency expertise." *State Farm Ins.*, at 43.

230.     By promulgating this new Rule, Defendants have acted arbitrarily and capriciously and have abused their discretion in violation of the APA.  The Rule is therefore invalid.

### FOURTH CAUSE OF ACTION

### (Violation of APA; 5 U.S.C. § 553—Procedural Rulemaking Violation)

231.     Plaintiffs re-allege and incorporate the foregoing paragraphs as if set forth in full.

232.     The APA generally requires agencies to provide the public notice and an opportunity to be heard before promulgating a regulation.  An agency wishing to promulgate a regulation must publish in the Federal Register a notice of proposed rulemaking that includes "(1) a statement of the time, place, and nature of public rule making proceedings; (2) reference to the legal authority under which the rule is proposed; and (3) either the terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. § 553(b).  After the notice has issued, "the agency shall give interested persons an opportunity to participate in the rulemaking through submission of written data, views, or arguments with or without opportunity for oral presentation." *Id*. § 553(c).

233.     In narrow circumstances, the APA exempts agencies from this notice and comment process where they can show "good cause" that the process would be either "impracticable, unnecessary, or contrary to the public interest." *Id*. § 553(b)(B).  The burden is on the agency to demonstrate good cause, and courts have interpreted the exception narrowly.  *See*, *e.g.*, *Lake Carriers' Ass'n v. EPA*, 652 F.3d 1, 6 (D.C. Cir. 2011).

66

Complaint for Declaratory Relief (Case no.____)

234.    Defendants have not and cannot demonstrate good cause for failing to give notice to the public or allowing for public comment prior to instituting a policy of non-enforcement against issuers that allow consumers to opt-out of the otherwise applicable and substantive requirement to include abortion coverage as a benefit in their qualified health plan.

235.    Notice and comment is particularly important in legally and factually complex circumstances like those presented here.  Notice and comment allows affected parties—including States—to explain the practical effects of a rule before it is implemented, and ensures that the agency proceeds in a fully informed manner, exploring alternative, less harmful approaches.  In the area of women's health care, it is particularly important to have an adequate notice and comment given that women are relying on having plans that contain abortion coverage.

236.    Because Defendants failed to follow section 553's notice and comment procedures, promulgating a final rule that was not prefigured nor contemplated by the proposed rule, the public and the States did not have an opportunity to comment upon it, as required by the APA. Therefore, the regulation is invalid.

## FIFTH CAUSE OF ACTION

### (Violation of the Tenth Amendment—Federalism)

237.    Plaintiffs re-allege and incorporate the foregoing paragraphs as if set forth in full.

238.    The Tenth Amendment to the United States Constitution provides, "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

239.    States have "the power to create and enforce a legal code, both civil and criminal." *Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592 (1982); V*irginia ex rel. Cuccinelli v. Sebelius*, 656 F.3d 253 (4th Cir. 2011).  Congress may not infringe on the States' sovereign authority to enforce its own laws.  "[W]hen a federal law interferes with a state's exercise of its sovereign 'power to create and enforce a legal code' [ ] it inflict[s] on the state the requisite injury-in-fact." *Cty. of Santa Clara v. Trump*, No. 17-CV-00485-WHO, 2017 WL 1459081, at *17 (N.D. Cal. Apr. 25, 2017), reconsideration denied, No. 17-CV-00485-WHO, 2017 WL 3086064 (N.D. Cal.

1   July 20, 2017), quoting *Ohio ex rel. Celebrezze v. U.S. Dep't of Transp.*, 766 F.2d 228, 233 (6th

2   Cir. 1985).

3       240.    HHS' disregard for the States' laws and policies violates the Tenth Amendment's

4   federalism principles.

5       241.    The Rule penalizes the States for requiring and allowing qualified health plans to

6   provide abortion coverage in its state-based exchanges.  The States of California, New York,

7   Maine, and Oregon have all enacted an abortion coverage mandate that requires health plans to

8   provide abortion coverage as part of its essential health benefits, and the State of Vermont, which

9   requires abortion be covered under its state's benchmark plan.  The State of Maryland and the

10  District of Columbia allow for the provision of abortion coverage in health plans.  This represents

11  the States' policy priorities related to safeguarding women's reproductive freedom by securing

12  abortion coverage to ensure that individuals have access to all the services they may need and

13  have the option of exercising constitutionally protected rights.

14      242.    The ACA authorizes the States' insurance commissioners as the entities primarily

15  responsible for monitoring, overseeing, and enforcing the provisions in Section 1303 related to

16  qualified health plans segregation of funds for abortion services.  42 U.S.C. § 18023(b)(2)(E)(i);

17  45 C.F.R. § 156.280(e)(5).  This in itself demonstrates that the ACA contemplated state-

18  flexibility that state-based exchanges were designed to retain.

19      243.    HHS simply runs past this, instead threatening to step in and enforce these

20  unreasonable changes in the State's place, or worse, short-change the States due HHS federal

21  funding for failing to bend to their regulatory scheme.

22      244.    First, the Rule states that "if HHS determines that a state (or State Exchange) has

23  failed to substantially enforce a federal requirement related to Exchanges and the offering of

24  QHPS through Exchanges, including section 1303 of the PPACA's separate payments

25  requirement (or other requirements), the Secretary may step in to enforce the requirement against

26  the non-compliant issuer."  84 Fed. Reg. at 71,692 (citing 42 U.S.C. § 18041(c)(2)).

27      245.    Second, under 42 U.S.C. § 18033(a)(4) (2018), HHS may conclude that the States'

28  inability to comply, or allow issuers to comply, with the Rule amounts to a "pattern of abuse"

regarding compliance with HHS standards related to Title I of the ACA.  If "the Secretary determines that an Exchange has engaged in serious misconduct with respect to compliance with the requirements of, or carrying out of activities required" under the ACA, HHS has the authority to rescind up to one percent (1%) of the federal funding dollars due to a state *under any program administered by HHS*.  84 Fed. Reg. 71,678.

246.     This is significant, because 1% of annual HHS funds amounts to substantial federal dollars at risk for the States.  Therefore, noncompliance with the Rule risks millions of federal dollars paid to the States for the administration of health programs such as Medicaid.

247.     In addition, HHS and CMS recent actions demonstrate the administration's commitment to impeding abortion access and interfering with state sovereignty.  On January 24, 2020, the Office of Civil Rights of HHS issued a "Notice of Violation to California for its Abortion Coverage Mandate," which at its core implicates California's police powers over its regulation of healthcare, "notifying California that it cannot impose universal abortion coverage mandates on health insurance plans and issuers in violation of federal conscience laws."[31]  The letter indicates that if California does not receive sufficient assurance that the state will come into compliance with federal law within 30 days, the "action may ultimately result in limitations on continued receipt of certain HHS funds."  This puts California, and the States at large, in a vulnerable position, fearing HHS will seek extreme enforcement actions or penalties merely for choosing to protect their public health interests.

248.     The Rule runs parallel with this recent CMS action, and is a powerful use of coercion to induce the States to change their sovereign laws—properly promulgated under its police powers—and accept federally imposed policy changes with respect to access to abortion coverage.  *See Nat'l Fed'n Indep. Bus. v. Sebelius* 567 U.S. 519, 578 ("The Constitution simply does not give Congress the authority to require the States to regulate.").  Complying with the Rule's onerous and excessive changes could in effect cause issuers to leave the States' exchanges,

---

[31] *See* https://www.hhs.gov/about/news/2020/01/24/hhs-issues-notice-of-violation-to-california-for-its-abortion-coverage-mandate.html.

putting at risk the viability of a strong insurance market in the jurisdictions that require or allow abortion coverage.

249.     Accepting these changes not only threatens the States' sovereignty but would require the States to incur significant administrative costs to implement efforts that actually increase risks to its public health and their marketplaces.  Compliance with this Rule will undermine our States' police powers over healthcare, and require extensive diversion of resources, interfering with enrollment rates and the insurance risk pool.

250.     The Rule will impermissibly impose burdens on the States' sovereignty.

251.     By promulgating the Rule, Defendants have violated the Tenth Amendment of the U.S. Constitution.  Defendants' violation in itself causes ongoing harm to the States and their residents.  The Rule violates the U.S. Constitution and is therefore invalid.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff States respectfully requests that this Court:

1.   Issue a declaratory judgment that the Rule is an unreasonable interpretation of the law;

2.   Issue a declaratory judgment that the Rule is arbitrary, capricious, an abuse of discretion, not in accordance with law, and contrary to the States' constitutional rights, powers, privileges and immunities, in violation of the Administrative Procedure Act because HHS failed to justify reasons for the change in policy and respond adequately to the public comments it received;

3.   Issue a declaratory judgment that the Rule engaged in improper procedural rulemaking in violation of the Administrative Procedure Act;

4.   Issue a declaratory judgment that the Rule violates the Tenth Amendment;

5.   Postpone the effective date of the Rule, pending judicial review, pursuant to 5 U.S.C. § 705;

6.   Hold unlawful and set aside the Rule, pursuant to 5 U.S.C. § 706(2);

7.   Award the States costs, expenses, and reasonable attorneys' fees;

8.   Award such other relief as the Court deems just and proper.

1

2   Dated:  January 30, 2020                          Respectfully submitted,

3                                                     XAVIER BECERRA
                                                      Attorney General of California
4                                                     KATHLEEN BOERGERS
                                                      Supervising Deputy Attorney General
5                                                     KETAKEE R. KANE
                                                      MICHAEL GOLDSMITH
6

7

8                                                     */s/ Brenda Ayon Verduzco*

9                                                     BRENDA AYON VERDUZCO
                                                      Deputy Attorneys General
10                                                    *Attorneys for Plaintiff State of California*

11

12                                                    LETITIA JAMES
                                                      Attorney General of New York
13                                                    MATTHEW COLANGELO
                                                      Chief Counsel for Federal Initiatives
14                                                    BRANT CAMPBELL
                                                      COLLEEN K. FAHERTY
15                                                    Assistant Attorneys General

16
                                                      /s/ *Lisa Landau*
17                                                    LISA LANDAU
                                                      Chief, Health Care Bureau
18                                                    28 Liberty Street
                                                      New York, NY 10005
19                                                    Phone: (212) 416-8542
                                                      Lisa.landau@ag.ny.gov
20                                                    *Attorneys for Plaintiff the State of New York*

21

22

23

24

25

26

27

28

Complaint for Declaratory Relief (Case no.____)

1

2          KARL A. RACINE
           Attorney General for the District of Columbia
3          KATHLEEN KONOPKA
           Deputy Attorney General
4          Public Advocacy Division

5          /s/ *Alacoque Hinga Nevitt*
           ALACOQUE HINGA NEVITT
6          Assistant Attorney General
7          441 4th Street, N.W.
           Washington, DC 20001
8          Tel (202) 724-6532
           Fax (202) 730-1900
9          alacoque.nevitt@dc.gov
10         *Attorneys for Plaintiff District of Columbia*

11         AARON M. FREY
           Attorney General of Maine
12
           /s/ *Susan P. Herman*
13         SUSAN P. HERMAN*
           Chief Deputy Attorney General
14         6 State House Station
15         Augusta, ME 04333-0006
           Telephone: (207) 626-8814
16         susan.herman@maine.gov
           *Attorneys for Plaintiff State of Maine*
17         * *pro hac vice pending*

18         BRIAN E. FROSH
19         Attorney General of Maryland
           STEVEN M. SULLIVAN
20         Solicitor General

21         /s/ *Kimberly S. Cammarata*
22         KIMBERLY S. CAMMARATA
           Director, Health Education and Advocacy
23         200 St. Paul Place
           Baltimore, MD 21202
24         Telephone: (410) 576-7038
           kcammarata@oag.state.md.us
25         *Attorneys for Plaintiff the State of Maryland*

26

27

28

1

2                                ELLEN F. ROSENBLUM
                                Attorney General of Oregon

3                                MICHAEL C. KRON
                                Special Counsel

4                                DEANNA J. CHANG

5                                /s/ Nicole DeFever

6                                J. NICOLE DEFEVER
                                Senior Assistant Attorneys General

7                                100 SW Market Street
                                Portland, OR 97201

8                                nicole.defever@doj.state.or.us
                                *Attorneys for Plaintiff the State of Oregon*

9

10                               THOMAS J. DONOVAN, JR.
                               Attorney General of Vermont

11

12                               /s/ Eleanor Spottswood
                               Eleanor Spottswood*

13                               Assistant Attorney General
                               Office of the Attorney General

14                               109 State Street
                               Montpelier, VT 05609-1001

15                               (802) 828-5500
                               eleanor.spottswood@vermont.gov

16                               *pro hac vice pending*

17  SA2018103397

18

19

20

21

22

23

24

25

26

27

28

Complaint for Declaratory Relief (Case no.____)