UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

| | |
|---|---|
| STATE OF CALIFORNIA, *et al.*, | Case No. 20-cv-00682-LB |
| Plaintiffs, | **ORDER GRANTING THE PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND DENYING THE DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| U.S. DEPT. OF HEALTH AND HUMAN SERVICES, *et al.*, | |
| Defendants. | Re: ECF Nos. 36 & 43 |

### INTRODUCTION

Section 1303(b)(2)(B) of the Affordable Care Act ("ACA") requires health-insurance issuers to collect separate payments from policy holders ("enrollees" in the insurance plans) for premiums for abortion services and for non-abortion services. 42 U.S.C. § 18023(b)(2)(B). The Department of Health and Human Services ("HHS") issued a rule in 2015 that allowed issuers to satisfy the separate-payment requirement by sending a single bill that itemized the premium for abortion services, sending a separate bill for the premium for abortion services, or sending a notice at enrollment specifying the separate charge. 80 Fed. Reg. 10,750, 10,840 (Feb. 27, 2015) (codified at 45 C.F.R. § 156.280). In 2019, HHS replaced the 2015 rule with a new rule that required issuers to send enrollees two separate bills, and enrollees to make two separate payments, to reflect the split between abortion and non-abortion premiums. 84 Fed. Reg. 71,674, 71,684 (Dec. 27, 2019)

United States District Court
Northern District of California

(codified at 45 C.F.R. pt. 155, 156). In this lawsuit, six states and the District of Columbia sued HHS to invalidate the rule and moved for summary judgment on the following grounds: (1) the rule is arbitrary and capricious under the Administrative Procedures Act ("APA") because HHS did not give a reasoned explanation for the policy change, ignored high costs that accompanied it, ignored the evidence about the harms, and imposed measures with no rational connection to its objective; (2) the rule is contrary to several sections of the ACA; (3) HHS exceeded its statutory authority when it promulgated the rule; (4) HHS failed to follow APA procedures; and (5) the rule violates the Tenth Amendment.[1] HHS moved for summary judgment on the grounds that the new rule does not violate the ACA, the APA, or the Tenth Amendment, and it did not exceed its authority by promulgating the rule.[2]

The court grants the plaintiffs' summary-judgment motion, and denies HHS's summary-judgment motion, on the ground that the rule is arbitrary and capricious.

## STATEMENT

### 1. The ACA

The ACA created state health-insurance exchanges to allow customers to buy private insurance plans, and it provided federal subsidies to lower the cost of coverage to eligible enrollees. 42 U.S.C. §§ 1396w-3(b)(1)(B)–(C); *King v. Burwell*, 135 S. Ct. 2480, 2485–87 (2015). Federal law generally prohibits the use of federal funds for abortion services (except for rape, incest, or pregnancy that endangers the mother's life) through the Hyde Amendment, which is enacted annually in the annual appropriations bills for HHS and certain other agencies. 42 C.F.R. §§ 441.200, 441.202, 441.203; *see Harris v. McRae*, 448 U.S. 297, 300-04 (1980). To ensure compliance with the Hyde Amendment, section 1303 of the ACA prohibits health-insurance issuers from using federal subsidies to pay for non-Hyde abortion services. 42 U.S.C. § 18023(b)(2)(A). If a health plan covers abortion services, then the issuer must collect from each

---

[1] Compl. – ECF No. 1; Pls. Mot. – ECF No. 36 at 24–48. Citations refer to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of documents.

[2] Defs. Cross-Mot. – ECF No. 43.

United States District Court
Northern District of California

enrollee ("without regard to the enrollee's age, sex, or family status) a separate payment for" (1) the portion of the premium for the non-Hyde abortion services equal to the actuarial value of that coverage (and that is at least $1 per month) and (2) the portion of the premium for services other than abortion services. *Id.* § 18023(b)(2)(B). The separate payments must be deposited into "separate allocation accounts." *Id.* The segregated funds can be used only for their separate purposes, meaning, payments for abortion services are used only for abortion services and payments for other services are used only for other services. *Id.* § 18023(b)(2)(C). Under the ACA, state health-insurance commissioners ensure that health plans comply with the segregation requirements. *Id.* § 18023(b)(2)(E)(i).

The ACA also has notice procedures. It requires issuers to send enrollees notice of the plan's inclusion of abortion coverage "only as part of the summary of benefits and coverage explanation, at the time of enrollment, of such coverage." *Id.* § 18023(b)(3)(A). The notice also "shall provide information only with respect to the total amount of the combined payments for [non-Hyde abortions] . . . and other services covered by the plan." *Id.* § 18023(b)(3)(B).

## 2.   The 2015 Rule

In 2015, the Government Accountability Office ("GAO") identified inconsistencies by 18 issuers in 10 states with health plans that offered abortion services: two issuers who did not collect the statutory $1, four issuers who did not include the required notices, and other issuers who did not collect payments by sending a bill itemizing the separate payments or sending separate bills for the two premiums.[3] In response, in 2015, HHS proposed and finalized a rule establishing that issuers could satisfy section 1303 in several ways: (1) sending an enrollee a single monthly bill that separately itemized the premium amount for non-Hyde abortion services; (2) sending a separate monthly bill for non-Hyde abortion services; or (3) sending an enrollee a notice at or soon after enrollment that the monthly invoice or bill will include a separate charge for the non-Hyde abortion services and specifying the charge. 45 C.F.R. § 156.280. The rule allowed enrollees to

---

[3] Pls. Mot. – ECF No. 36 at 13–14. HHS did not dispute this account.

make one payment (a "single transaction") for the segregated services. *Id.* The issuer then deposited the separate payments into the two segregated accounts. *Id.*

In October 2017, the Centers for Medicare & Medicaid Services' Center for Consumer Information and Insurance Oversight issued a bulletin confirming that these alternatives comply with section 1303's segregated funding requirements.[4]

### 3.   The New Rule

In November 2018, the agency proposed the new rule that the plaintiffs challenge in this lawsuit: a rule that requires (1) issuers to send two separate bills each month for the premium for non-Hyde abortion services and the premium for other services and (2) enrollees to pay the two bills in separate transactions. 83 Fed. Reg. 56,015, 56,030–031 (Nov. 9, 2018). HHS said that its proposed rule "would better align the regulatory requirements for QHP [(qualified health plan)] issuer billing of enrollee premiums with the separate payment requirement in section 1303 of the [ACA]." *Id.* at 56,022. HHS received nearly 75,000 public comments to its proposed rule.[5] Some supported the rule, but a majority did not.[6]

For example, state exchanges said that the proposal could result in significant consumer confusion and loss of insurance coverage.[7] Even with consumer outreach and education

---

[4] Centers for Medicare and Medicaid Services, *CMS Bulletin Addressing Enforcement of Section 1303 of the Patient Protection and Affordable Care Act* (Oct. 06, 2017), https://www.cms.gov/CCIIO/Resources/Regulations-and-Guidance/Downloads/Section-1303-Bulletin-10-6-2017-FINAL-508.pdf.

[5] Pls. Mot. – ECF No. 36 at 15; Defs. Mot. – ECF No. 43 (HHS does not dispute this characterization); Administrative Record ("AR") – ECF No. 38. AR citations refer to the numbers at the upper left of the AR pages.

[6] Pls. Mot – ECF No. 36 at 15.

[7] AR 078652 (Covered California); AR 81027 (New York State of Health); AR 81099–81100 (Connect for Health Colorado); AR 81070 (Connecticut's Access Health CT); AR 80936–37 (District of Columbia Health Benefit Exchange Authority); AR 76518 (Silver State Health Insurance Exchange).

United States District Court
Northern District of California

campaigns, the exchanges predicted that most policy holders would not understand the purpose of the two bills or why they had to send separate payments.[8]

Other stakeholders described confusion that would cause consumers to not complete their initial enrollment. After enrolling, consumers must make their first month's premium payment — known as a "binder" payment — in full, and if they do not, there is no coverage. Because the proposed rule required two payments (at least $1 and a separate payment for the balance of the premium), some consumers would miss the full payment and thus would not initiate coverage.[9]

Physicians and professional medical associations echoed the concerns that policy holders who failed to pay the abortion-related premium would be left without coverage, resulting in a disproportionate impact on vulnerable communities.[10] Consumer-advocacy groups explained that the current process aligned with industry practice and was endorsed by the National Association of Insurance Commissioners.[11] Bundled coverage — such as life-and-disability insurance or home-and-car insurance — is commonplace because it allows policy holders to pay for multiple policies in one transaction with the same instrument.[12] Sending two bills also harms consumers, who might suspect that a bill for a nominal amount is a "scam" or otherwise ignore the bill.[13]

Issuers identified operational burdens, including Blue Shield of California's identification of up to $7 million in annual costs, costs to medium-sized health plans (of about 70,000 enrollees) of

---

[8] AR 76518 (Silver State Health Insurance Exchange).

[9] AR 81071 (Connecticut's Access Health CT); AR 78737 (Multistate Attorney Generals); AR 80263–65 (Blue Cross Blue Shield Association); AR 81302 (National Family Planning & Reproductive Health Association); AR 78720–21 (Vermont Legal Aid); AR 81310–11 (The American College of Obstetricians and Gynecologists).

[10] *See* AR 80953 (American Academy of Family Physicians, American Academy of Pediatrics, American College of Obstetricians and Gynecologists, American College of Physicians, American Medical Association, and the American Psychiatric Association group comment).

[11] AR 072862 (California Department of Insurance); AR 80207 (American Health Insurance Plans); AR 81218 (Center on Budget and Policy Priorities); AR 79777 (Planned Parenthood); AR 80489 (California Pan-Ethnic Health Network); AR 81334–35 (Western Center on Law & Poverty).

[12] AR 80207 (American Health Insurance Plans); AR 81335 (Western Center for Law and Poverty); AR 76527 (State of Oregon, Department of Consumer and Business Services).

[13] AR 79778 (Planned Parenthood Federation of America); AR 80263–64 (Blue Cross Blue Shield Association); AR 78736–37 (Multistate Attorney Generals).

1  significant costs, and the cost and time to implement revised billing systems (12 to 18 months to

2  revamp the systems and up to two years to implement the systems).[14]

3      State entities identified the increased regulatory and fiscal burdens from the proposed rule,

4  such as significant administrative costs and the need to invest in increased call-center training and

5  consumer assistance to handle the expected increase in consumer queries, complaints, and

6  terminations resulting from non-payments.[15] They said that the "loss of coverage will also

7  decrease the size of the risk pool and increase the cost of uncompensated care, which will drive

8  medical costs and health insurance rates higher, further limiting access to coverage"[16] and that

9  "the proposed [rule] would create substantial new regulatory burdens for both QHP issuers and

10  consumers, without increasing program integrity."[17]

11      In December 2019, HHS published the final rule requiring issuers to send, and enrollees to pay

12  separately, separate bills each month for the premium for non-Hyde abortion services and the

13  premium for other services. 84 Fed. Reg. at 71,710–711 (Dec. 27, 2019) (codified at 45 C.F.R. pt.

14  155–56). Issuers could no longer send a single monthly bill that includes costs for abortion

15  coverage and non-abortion healthcare coverage, even if the bill itemized the separate premium

16  payment for abortion services, and they could not notify enrollees as part of the summary of

17

18  [14] AR 81321–22 (Blue Shield of California) (raising significant operational burdens, potentially up to $7 million in annual costs); *see also* AR 80207–08 (American Health Insurance Plans) (initial costs
19  could run as high as $7.5 million per issuer with compliance costs going as high as $10.8 million); AR 81166 (Association of Community Affiliated Plan) (discussing that for medium-sized health plans, of
20  about 70,000 enrollees, CMS underestimated the costs on issuers by 2,666 times for the first year alone);; AR 80264 (Blue Cross Blue Shield Association's billing systems); AR 80212 (American
21  Health Insurance Plans' billing systems).

22  [15] AR 78734 (Multistate Attorney Generals); AR 76527 (State of Oregon, Department of Consumer and Business Services); AR 81040–43 (State of Washington); AR 80490 (California Pan-Ethnic
23  Health Network); AR 79394 (National Women's Law Center); AR 76518 (Silver State Health Insurance Exchange); AR 78652–53 (Covered California); AR 81070–71 (Access Health CT); AR
24  80936–37 (District of Columbia Health Benefit Exchange Authority); AR 81029 (New York State of Health); AR 81101 (Connect for Health Colorado ) ( "mid-year implementation" posed additional
25  significant administrative complexities).

26  [16] AR 76527 (State of Oregon, Department of Consumer and Business Services); *see* AR 78752 (Multistate Attorney Generals) (the rule will interfere with gains in enrollment rates and the insurance
27  risk pool); AR 81028 (New York State of Health) (the rule will "reverse recent reductions in uncompensated care").

28  [17] AR 80211 (America's Health Insurance Plans).

*United States District Court*
*Northern District of California*

benefits and coverage at the time of enrollment. *Id.* Instead, the issuers must send two monthly

bills, either in an envelope with separate bills or electronically via two separate emails, to each

enrollee. *Id.* Issuers also must instruct enrollees to pay each bill separately, either by two checks or

two electronic transactions. *Id.* It required implementation of the new rule in six months, or by

June 27, 2020, which is in the middle of the plan year, when most insurers are calculating and

negotiating charges for the next plan year. *Id.* at 71,711.[18]

HHS explained the reasons for the new two-bills/two-payments rule:

> As explained in the proposed rule, HHS now believes that some of the methods for billing and collection of the separate payment for coverage of non-Hyde abortion services described as permissible in the preamble to the 2016 Payment Notice do not adequately reflect Congress's intent. We believe Congress intended that QHP issuers collect two distinct (that is, ''separate'') payments, one for the coverage of non-Hyde abortion services, and one for coverage of all other services covered under the policy, rather than simply itemizing these two components in a single bill, or notifying the enrollee that the monthly invoice or bill will include a separate charge for these services.

*Id.* at 71,684.

HHS recognized that it underestimated the costs of implementation in HHS's earlier cost-

benefit analysis (resulting in $4.1 million in higher contracting costs for each insurer for system

changes and overtime payments for personnel for over 2.9 million hours of extra work and total

costs of $385 million for all issuers). *Id.* at 71,697. It recognized the additional annual costs of

$1.07 million per issuer annually (about $100.2 million for all issuers). *Id.* at 71,698. It estimated

the one-time costs to state exchanges ($750,000 for the one-time costs for a total of $9 million for

the 12 states offering abortion coverage) and ongoing costs of $2.4 million for 2020 and $3.6

million for 2020 to 2024. *Id.* at 71,704–05. It also estimated costs to enrollees for their personal

administrative burdens of $35.5 million in the first year. *Id.* at 71,707.

To address the impact on consumers, the rule prohibits issuers from initiating a grace period or

terminating an enrollee's coverage if the enrollee does not pay the premium bill separately and

continues to make a combined single payment. *Id.* at 71,711. In such a case, the issuer would treat

the "portion of the premium attributable to coverage of . . . abortion services as a separate payment

---

[18] Pls. Mot. – ECF No. 36 at 20.

United States District Court
Northern District of California

and must disaggregate the amounts into the separate allocation accounts, consistent with § 156.280 (e)(2)(iii)." *Id.*at 71,685. HHS will not penalize issuers that adopt a uniform policy that declines to put policy holders in grace periods or terminate coverage for failure to pay the separate bill for abortion coverage, but the rule does not relieve the enrollee from making the separate payment and requires issuers to try to collect the premium for abortion coverage. *Id.* at 71,686.

The final rule added a new provision that was not subject to public comment: it allows enrollees to opt out of abortion coverage by choosing not to pay the premium attributable to abortion services. *Id.* at 71,686–87. Enrollees cannot retract the decision in the plan year. *Id.* at 71,687. The enrollee's decision would apply to everyone in the enrollment group, such as covered dependents (children up to the age of 26) and spouses. *Id.*

Due to the COVID-19 pandemic, HHS extended the deadline for implementation of the rule to August 26, 2020.[19]

## 4.  Procedural History

The plaintiffs filed the complaint on January 30, 2020.[20] The parties filed cross-motions for summary judgment.[21] All parties consented to the undersigned's jurisdiction.[22] The court held a hearing on June 25, 2020.[23]

## STANDARD OF REVIEW

Under the APA, "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. The challenged agency action (if not made reviewable by

---

[19] Verduzco Decl. – ECF No. 37 at 2 (¶¶ 5–7); 85 Fed. Reg. 27,550, 27,599 (May 8, 2020).

[20] Compl. – ECF No. 1; First Am. Compl. – ECF No. 25.

[21] Pls. Mot. – ECF No. 36; Cross-Mot. – ECF No. 43.

[22] Consent Forms – ECF Nos. 20 & 31.

[23] Minute Entry – ECF No. 60.

1    statute) must be a "final agency action for which there is no other adequate remedy in a court[.]" 5

2    U.S.C. § 704; *see Navajo Nation v. Dep't of the Interior*, 876 F.3d 1144, 1171 (9th Cir. 2017)."

3          "The reviewing court shall . . . hold unlawful and set aside agency action, findings, and

4    conclusions found to be — (A) arbitrary, capricious, an abuse of discretion, or otherwise not in

5    accordance with law[.]" 5 U.S.C. § 706(2). "'Review under the arbitrary and capricious standard is

6    deferential[.]'" *Friends of the Santa Clara River v. U.S. Army Corps of Eng'rs*, 887 F.3d 906, 920

7    (9th Cir. 2018) (quoting *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 658

8    (2007)). "[A court's] proper role is simply to ensure that the agency made no 'clear error of

9    judgment' that would render its action 'arbitrary and capricious,' and [courts] require only 'a

10   rational connection between facts found and conclusions made' by the defendant agencies." *Id.*

11   (some internal quotation marks and internal brackets omitted) (quoting *Lands Council v. McNair*,

12   537 F.3d 981, 993 (9th Cir. 2008) (en banc), *abrogated on other grounds by Winter v. Nat. Res.*

13   *Def. Council, Inc.*, 555 U.S. 7 (2008)); *see Conservation Cong. v. Finley*, 774 F.3d 611, 617 (9th

14   Cir. 2014)).

15         "Accordingly, [courts] will not vacate an agency's decision unless the agency 'has relied on

16   factors which Congress has not intended it to consider, entirely failed to consider an important

17   aspect of the problem, offered an explanation for its decision that runs counter to the evidence

18   before the agency, or is so implausible that it could not be ascribed to a difference in view or the

19   product of agency expertise.'" *Id.* at 921 (some internal quotation marks and internal brackets

20   omitted) (quoting *Nat'l Ass'n of Home Builders*, 551 U.S. at 658); *accord Sierra Club v.*

21   *Bosworth*, 510 F.3d 1016, 1022 (9th Cir. 2007) ("[Courts] are 'not empowered to substitute [their]

22   judgment for that of the agency.'") (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401

23   U.S. 402, 416 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977)).

24   "Agencies are free to change their existing policies as long as they provide a reasoned explanation

25   for the change." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016). "When an

26   agency changes its existing position, it 'need not always provide a more detailed justification than

27   what would suffice for a new policy created on a blank slate.'" *Id.* at 2125–26 (*quoting FCC v.*

28   *Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)).

United States District Court
Northern District of California

1    "Nevertheless, to withstand review[,] 'the agency must articulate a rational connection

2    between the facts found and the conclusions reached.'" *Sierra Club*, 510 F.3d at 1023 (internal

3    brackets omitted) (quoting *Earth Island Inst. v. U.S. Forest Serv.*, 442 F.3d 1147, 1156–57 (9th

4    Cir. 2006), *abrogated on other grounds by Winter*, 555 U.S. 7). "[Courts] will defer to an agency's

5    decision only if it is 'fully informed and well-considered,' and [they] will disapprove of an

6    agency's decision if it made 'a clear error of judgment.'" *Id.* (some internal quotation marks

7    omitted) (quoting *Save the Yaak Comm. v. Block*, 840 F.2d 714, 717 (9th Cir. 1988); *West v. Sec'y*

8    *of the Dep't of Transp.*, 206 F.3d 920, 924 (9th Cir. 2000)). "Furthermore, when an agency has

9    taken action without observance of the procedure required by law, that action will be set aside."

10   *Id.* (citing *Idaho Sporting Cong., Inc. v. Alexander*, 222 F.3d 562, 567–68 (9th Cir. 2000)).

11       "'When a party seeks review of agency action under the APA before a district court, the

12   district judge sits as an appellate tribunal.'" *Herguan Univ. v. Immigr. & Customs Enf't*, 258 F.

13   Supp. 3d 1050, 1063 (N.D. Cal. 2017) (internal brackets omitted) (quoting *Rempfer v. Sharfstein*,

14   583 F.3d 860, 865 (D.C. Cir. 2009)). "In APA cases the administrative record is 'the whole

15   record,' which 'consists of all documents and materials directly or indirectly considered by agency

16   decision-makers.'" *Id.* at 1063–64 (quoting *Thompson v. U.S. Dep't of Labor*, 885 F.2d 551, 555

17   (9th Cir. 1989); *Portland Audubon Soc'y v. Endangered Species Comm.*, 984 F.2d 1534, 1548 (9th

18   Cir. 1993)).

19       A motion for summary judgment may be used to seek judicial review of agency administrative

20   decisions. *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471–72 (9th Cir. 1994).

21

22                                    **ANALYSIS**

23       In its new rule, HHS interpreted the statute's requirement of separate payments for separate

24   premiums — specifically, an issuer "shall collect from each enrollee in the plan . . . a separate

25   payment for" the premiums for abortion and non-abortion services and segregate them in different

26   accounts — as requiring issuers to send two bills for the two categories of services, and enrollees

27   to pay the bills in two transactions. 42 U.S.C. § 18023 (b)(2)(B). (As discussed above, HHS

28   allows enrollees to make a combined single payment, and it requires issuers to accept those single

payments.) HHS contends that its interpretation is reasonable and better aligns issuer billing with the statute: rather than "simply itemizing these two components of a single billed amount," as the previous rule allowed, the statutory provisions "contemplate[] issuers billing for two separate 'payments' of these two amounts (for example, two different checks or two different transactions)." 83 Fed. Reg. at 56,022; *see* 84 Fed. Reg. at 71,685.[24] HHS also contends that its interpretation is within its statutory authority and is entitled to *Chevron* deference.[25]

In support of the new rule, HHS explained that it believed that requiring two separate bills (from issuers) and two transactions (from enrollees) better aligned with Congress's intent under the ACA for "collecting separate payments." 84 Fed. Reg. at 71,684 (set forth in the Statement, *supra*).[26] HHS's belief is not an explanation: it concludes that that the prior rule did not adequately reflect Congress's intent (without explaining why), and it provides no context for why its belief advances Congress's intent. *See id.* An agency can change its mind if it provides a reasoned explanation. *Encino Motorcars*, 136 S. Ct. at 2125. But when an agency overrules its prior policy, it should at least explain why, especially when there is industry reliance on the earlier rule. *Id.* at 2126–27 (in reversing the Ninth Circuit's according *Chevron* deference to the Department of Labor's interpretation of the Fair Labor Standards Act's overtime requirements, the Court said that "the Department said almost nothing . . . except that it would not treat [the employees] as exempt because 'the statute did not include such positions and the Department recognizes that there are circumstances under which the requirements for the exemption would not be met.' 76 Fed. Reg. 18838. It continued that it 'believes that this interpretation is reasonable' and 'sets forth the appropriate approach.' *Ibid.*") HHS did not provide a reasoned explanation, and the new rule thus is arbitrary and capricious.

The following points support this conclusion.

---

[24] Defs. Cross-Mot. – ECF No. 43 at 11, 19–20.

[25] *Id.* at 11–12, 17–27.

[26] *Id.* at 17–23.

United States District Court
Northern District of California

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

First, the 2015 Rule resulted from a GAO audit that revealed actual problems. By contrast, nothing in the administrative record shows any noncompliance with section 1303. To the contrary, the state Attorney Generals Multistate Comment Letters are filed every year and provide the accounting assurance that no federal funds are used for abortion services.[27] HHS proffers no reasoned explanation for its change of course. *See Encino Motorcars*, 136 S. Ct. at 2126.

Second, HHS's 2015 rule was based on standard health-insurance industry practice of bundled coverage and single-transaction payments, and many commenters described how states, issuers, and enrollees relied on that policy and how HHS's proposed change of course increased costs, created enrollee confusion, and risked reduced healthcare coverage (which contravenes the ACA's purpose). Industry reliance on the earlier rule is a relevant consideration. *Id.* at 2126–27. HHS did not provide a reasoned explanation about why it departed from its prior policy.

Third, HHS contends that its rule — two billings from issuers and two transactions from enrollees (to account for the premiums for abortion services and for non-abortion services) — is a reasonable interpretation of Congress's requirement that issuers "collect . . . a separate payment." 42 U.S.C. § 18023(b)(2)(B)(i).[28] But the statute does not require separate billings from insurers or separate transactions from enrollees. Moreover, the statute's notice provisions require notice to enrollees of the plan's inclusion of abortion coverage "only as part of the summary of benefits and coverage explanation, at the time of enrollment, of such coverage." 42 U.S.C. § 18023(b)(3)(A). In sum, the statute does not require or even suggest separate billings by issuers or separate transaction-payments by consumers.

HHS also contends that its interpretation is entitled to *Chevron* deference.[29] Assuming that the statute is ambiguous, again, HHS did not identify any reasons why it changed its prior policy and (in essence) says that its statutory interpretation is reason enough to change course. It is not. *Id.* at

---

[27] 6/25/2020 Hr'g Tr. – ECF No. 63 at 16 (p. 16:11–16); *see* AR 78734–78755 (Multistate Attorney Generals).

[28] Defs. Cross-Mot. – ECF No. 43 at 18–21, 33–35.

[29] *Id.* at 22–23.

1226–27. HHS must identify some problem that it is solving or benefit that it is achieving, meaning it must give a reasoned explanation. *Id.*

HHS also contends that the new rule "makes it more likely that issuers will comply with the additional requirement in Section 1303(b)(2)(B)(ii) that [issuers] maintain separate allocation accounts" to segregate premium payments for abortion services, but it does not explain how.[30] This goes to the issuers' responsibilities under section 1303: calculate the actuarial value for the portion of the premium attributable to abortion services, notify enrollees at the time of enrollment, collect separate payments, segregate the funds, and deposit them into separate allocation accounts to ensure that the funds are used for dedicated purposes. 42 U.S.C. §§ 18023(b)(2)(A)–(B),18023(b)(3). As the plaintiffs point out, separate billing transactions do nothing to affect the segregation and allocation of the payments after they are collected.[31] This is especially true because — notwithstanding the new rule's requirement that enrollees pay the abortion and non-abortion premiums in two transactions (two checks or two electronic payments) — HHS has mandated that issuers must accept single-transaction payments from enrollees.[32]

Moreover, the transactional costs to states, issuers, and enrollees (summarized in the Statement) are substantial and immediate (given the six-month implementation date in the middle of the plan year). (As the court said at the hearing, the two-month extension based on the pandemic does not ameliorate this timeline.)[33] HHS does not identify any transactional benefit.

HHS nonetheless argues that it adequately addressed costs. It contends that it addressed some costs (in the form of loss of coverage) by prohibiting issuers from terminating coverage for enrollees who pay their full premium in a single transaction.[34] It also contends that it "gave full

---

[30] *Id.* at 20.

[31] Pls. Opp'n – ECF No. 44 at 12.

[32] In light of its decision that the rule is arbitrary and capricious, the court does not reach the parties' arguments about whether HHS may exercise its enforcement discretion. The point here is that HHS gave no reasoned explanation for its new rule.

[33] 6/25/2020 Hr'g Tr. – ECF No. 63 at 25–26 (pp. 25:19–26:13).

[34] Defs. Cross-Mot. – ECF No. 43 at 37.

United States District Court
Northern District of California

consideration to the [other] costs and burdens the Rule would impose, and made reasonable efforts to minimize them."[35] *See* 84 Fed. Reg. at 71,697 (HHS recognized that the timeline increased costs to issuers by 50 percent). But then it summarily concludes that its "better interpretation" of the ACA "justifies the costs."[36] This is not a reasoned explanation. *Encino Motorcars*, 136 S. Ct. at 2126 (in promulgating its new policy (that the Court reversed), the Department of Labor said that "it had 'carefully considered all of the comments, analyses, and arguments made for and against the proposed changes.' 76 Fed. Reg. 18832.) And it does not show that HHS's "[c]onsideration of cost reflects the understanding that reasonable regulation ordinarily requires paying attention to the advantages and the disadvantages of agency decision." *Michigan v. EPA*, 135 S. Ct. 2699, 2707 (2015) (emphasis in the original).

Fourth, and finally, HHS's inclusion of a new provision (not subject to public comment) — allowing enrollees to opt out of abortion coverage by choosing not to pay the premium attributable to abortion services — supports the conclusion that HHS changed its prior policy without affording any reasoned explanation for the change. *Encino Motorcars*, 136 S. Ct. at 2125.

In sum, agencies can change their policies when they provide a reasoned explanation for the change. *Id.* The 2015 rule — grounded in a GAO audit that revealed problems with compliance — also allowed (as one option) issuers to bill separately for the abortion and non-abortion premiums. But here, HHS — by requiring two issuer bills and two consumer transaction-payments, at substantial transactional cost to states, issuers, and enrollees and without any corresponding benefit — does not advance a reasoned explanation for deviating from its prior rule and industry practice. The new rule is arbitrary and capricious.[37]

---

[35] *Id.* at 36.

[36] *Id.* at 38 (citing 84 Fed. Reg. at 71,695); Defs. Reply – ECF No. 52 at 20.

[37] Given this ruling, the court does not reach the plaintiffs' other arguments.

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

## CONCLUSION

The court grants summary judgment in favor of the plaintiffs and sets the rule aside. 5 U.S.C. § 706(2)(A); *Pollinator Stewardship Council v. E.P.A.*, 806 F.3d 520, 532 (9th Cir. 2015).

**IT IS SO ORDERED.**

Dated: July 20, 2020

_____
LAUREL BEELER
United States Magistrate Judge